GENERAL MOTORS CORPORATION, Plaintiff-Appellant, v. THE MOTOR VEHICLE REVIEW BOARD *et al.*, Defendants-Appellees (Loren Buick, Inc., Defendant-Appellant).

Fourth District   No. 4—04—0735

Opinion filed October 3, 2005.

STEIGMANN, J., specially concurring.
COOK, P.J., dissenting.

Edward R. Gower and Charles R. Schmadeke, both of Hinshaw & Culbertson, L.L.P., of Springfield, and Jeffrey J. Jones (argued) and J. Todd Kennard, both of Jones Day, of Columbus, Ohio, for appellant General Motors Corporation.

William J. Harte, of William J. Harte, Ltd., and Joseph E. Tighe, of Joseph E. Tighe, P.C., both of Chicago, and Thomas H. Wilson, of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellant Loren Buick, Inc.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Brett E. Legner, John P. Schmidt (argued), and Ellen B. Stanfield, Assistant Attorneys General, of counsel), for appellees Illinois Motor Vehicle Review Board and Terrence M. O'Brien.

Richard M. Karr (argued), of Gordon & Karr, L.L.P., of Chicago, and Edward W. Huntley, of Springfield, for appellee North Shore, Inc.

Ira M. Levin (argued) and Jay S. Dobrutsky, both of Burke, Warren, MacKay & Serritella, P.C., of Chicago, for appellees Grossinger Autoplex, Inc., Joe Mitchell Buick/GMC Truck, Inc., and Castle Buick-Pontiac-GMC, Inc.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiff, General Motors Corporation (GMC), and defendant Loren Buick, Inc. (Loren), appeal the Sangamon County circuit court's July 2004 order confirming the decision of defendant the State of Il-

linois Motor Vehicle Review Board (Review Board) that granted the protests filed by defendants North Shore, Inc., doing business as Muller Pontiac/GMC Mazda (North Shore); Grossinger Autoplex, Inc. (Autoplex); Joe Mitchell Buick/GMC Truck, Inc. (Mitchell); and Castle Buick-Pontiac, Inc. (Castle) (collectively "protesting dealers"), to GMC's proposal to add new GMC franchises to Loren and Jacobs Twin Buick (Jacobs). Specifically, GMC and Loren contend (1) the Review Board failed to apply the "good-cause" standard set forth in section 2(v) of the Motor Vehicle Franchise Act (Franchise Act) (815 ILCS 710/2(v) (West 2000)), (2) two of the Review Board's factual determinations were against the manifest weight of the evidence, (3) the Review Board's decision renders the Franchise Act unconstitutional, and (4) the protesting dealers are not entitled to attorney fees and costs. We affirm in part, vacate in part, and remand the cause to the Review Board.

GMC has established geographical areas of primary responsibility for its franchises. This case involves areas of primary responsibility that are labeled Chicago sections 1, 2, and 3. Loren is located in Glenview, Illinois, and is within section 2. Jacobs is located in Chicago, Illinois, and is within section 1. Chicago section 3 does not contain either proposed franchise but is referenced by the parties.

In February 2001, GMC sent letters to all GMC dealers in section 1, informing them of the proposed franchise addition to Jacobs. Castle and the Autoplex filed timely protests with the Review Board as to the Jacobs site. In February and March 2001, GMC sent letters to all GMC dealers in section 2, informing them of the proposed franchise addition to Loren. North Shore, the Autoplex, Mitchell, and Castle filed timely protests with the Review Board as to the Loren site. By agreement of the parties, the cases were consolidated.

The parties presented testimony and exhibits to the hearing officer on 19 days from May 2002 to December 2002. The transcripts of the hearing are voluminous, and the parties together presented approximately 200 exhibits. Thus, the testimony and exhibits will only be set forth as needed to explain our decision. While discussed by the witnesses at the hearing, we note the GMC geographical sections are for its use only. The Franchise Act uses the term "relevant market area," which is defined for a dealership that is in a county with a population of more than 300,000, as the area within a 10-mile radius of the dealership. 815 ILCS 710/2(q) (West 2000).

In May 2003, the hearing officer entered his findings of fact, conclusions of law, and recommended decision. The hearing officer recommended the protests against both the Jacobs and Loren sites be upheld and the Review Board should not approve the additional GMC

franchises. In September 2003, the Review Board entered a final order, granting the protesting dealers' protests, ordering GMC to pay $58,672.50 in Review Board expenses, and awarding the protesting dealers attorney fees and costs to be determined at a later hearing.

Pursuant to section 31 of the Franchise Act (815 ILCS 710/31 (West 2000)), GMC filed a complaint for administrative review with the Sangamon County circuit court in October 2003. On June 24, 2004, Loren filed a motion for leave to file its appearance *instanter* and to adopt GMC's arguments. That same day, the court held oral arguments on GMC's complaint, at which no one objected to Loren's motion. On July 20, 2004, the circuit court entered a docket entry, confirming the Review Board's decision. This appeal followed.

In reviewing a final judgment under the Administrative Review Law (735 ILCS 5/3—101 through 3—113 (West 2002)), this court reviews the agency's finding, not the circuit court's determination. *Tinder v. Department of Public Aid*, 346 Ill. App. 3d 510, 512, 805 N.E.2d 677, 679 (2004). In doing so, we hold the agency's findings and conclusions on questions of fact as "prima facie true and correct" (735 ILCS 5/3—110 (West 2002)) and will not disturb those findings and conclusions unless they are against the manifest weight of the evidence. *Smith v. Department of Public Aid*, 150 Ill. App. 3d 584, 586, 502 N.E.2d 42, 44 (1986). Moreover, we review *de novo* an agency's determination of questions of law. *Tinder*, 346 Ill. App. 3d at 512, 805 N.E.2d at 679. Last, if an issue involves the examination of the legal effect of a given set of facts, we apply the clearly erroneous standard. *XL Disposal Corp. v. Zehnder*, 304 Ill. App. 3d 202, 207, 709 N.E.2d 293, 297 (1999).

GMC and Loren first argue the Review Board applied the wrong "good-cause" standard. This issue presents a question of law.

■ When an existing franchise in the relevant market area of a proposed franchise files a protest pursuant to section 4(e)(8) of the Franchise Act, the Review Board must hold a hearing, at which the manufacturer has the burden of proof to establish that good cause exists to allow the establishment of the additional franchise. 815 ILCS 710/4(e)(8) (West 2000); see also 815 ILCS 710/29(c) (West 2000). The Review Board determines whether good cause exists under section 12(c) of the Franchise Act (815 ILCS 710/12(c) (West 2000)). 815 ILCS 710/4(e)(8) (West 2000). Section 12(c) requires the Review Board to consider all relevant circumstances in accordance with section 2(v) of the Franchise Act (815 ILCS 710/2(v) (West 2000)), including but not limited to the 11 circumstances set forth in that section. 815 ILCS 710/12(c) (West 2000). Section 2(v) defines "good cause" as "facts establishing commercial reasonableness in lawful or privileged

competition and business practices as defined at common law." 815 ILCS 710/2(v) (West 2000).

In its decision, the Review Board set forth the above statutory provisions and further noted section 12(c) was a balancing test, for which the case's relevant circumstances dictated what factors are included in the balance. Additionally, it noted that some of the factors addressed the relevant market area while others did not contain a geographical limitation, and thus it considered franchises outside the relevant market area when the factor did not limit itself to that area. The Review Board also noted "good cause shall not be shown solely by a desire for further market penetration." 815 ILCS 710/12(c)(7) (West 2000). After discussing the relevant evidence, the Review Board stated its findings of facts as to each of the section 12(c) factors for both proposed franchises, except for section 12(c)(11) (815 ILCS 710/12(c)(11) (West 2000)), which it found inapplicable to both franchises.

As stated, the Review Board set forth the Franchise Act's definition of "good cause" and analyzed each of the applicable factors as mandated by section 12(c) of the Franchise Act (815 ILCS 710/12(c) (West 2000)). This is the same analytical approach the Review Board took in *Jack Wolf Pontiac-Cadiallac-GMC Truck, Inc. v. General Motors Corp.-Cadillac Motor Car Division*, Ill. Motor Vehicle Review Bd. No. 19—96, at 13-20 (November 6, 1998), cited by GMC and Loren. In *Jack Wolf*, Ill. Motor Vehicle Review Bd. at 18, the Review Board did note in addressing section 12(c)(8) (815 ILCS 710/12(c)(8) (West 1998)), the public interest is not served by securing dealerships from losses caused by fair competition. While the Review Board did not make that statement in addressing section 12(c)(8) in this case, the Review Board did not make a statement to the contrary. It found the addition of the new franchises may be injurious to the public welfare and little to no public benefits will accrue because of the number of dealerships already in the area and the scarce inventory levels.

■ Further, GMC and Loren emphasize the "lawful or privileged competition" language of the "good-cause" standard (815 ILCS 710/2(v) (West 2000)) and assert the Review Board ignored it, creating "a protectionist standard that blocks competition whenever there is any possibility of harm." However, the standard is "*commercial reasonableness* in lawful or privileged competition" (emphasis added) (815 ILCS 710/2(v) (West 2000)), and the Review Board is to consider all relevant circumstances under section 12(c) of the Franchise Act (815 ILCS 710/12(c) (West 2000)). As noted by the Review Board in this decision, the good-cause standard is a balancing test. See *Southwest Jeep-Eagle v. Chrysler Corp.*, Ill. Motor Vehicle Review Bd. No. 23—97, at 6 (June 13, 1997) (noting the potential harm to the complainant must be

weighed against the factors listed in the Franchise Act). The harm to the existing franchises was just one of the factors the Review Board considered and weighed in determining whether GMC established good cause.

Accordingly, we find the Review Board applied the correct good-cause standard. Additionally, we note that while GMC and Loren described their assertions as the application of an incorrect legal standard, their arguments actually go toward the Review Board's application of the correct legal standard to the facts of this case, which is a mixed question of law and fact. See *Ford Motor Co. v. Motor Vehicle Review Board*, 338 Ill. App. 3d 880, 891, 788 N.E.2d 187, 197 (2003). However, on appeal, GMC and Loren have not asserted the Review Board's decision was clearly erroneous.

GMC and Loren next assert the Review Board's finding (1) a static market existed and (2) flaws existed in GMC's state and national performance standards were against the manifest weight of the evidence. We will find a determination is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or where a decision is unreasonable, arbitrary, and not based on any evidence. *Quinlan v. Stouffe*, 355 Ill. App. 3d 830, 836, 823 N.E.2d 597, 602 (2005).

Since these issues both address the measurement of dealer performance, which also plays into other factors, we will set forth a brief background on the parties' expert witnesses' testimony. GMC first established the "average" (also referred to as a "C student") as the standard of performance. Any dealership that was below average was considered underperforming. GMC's expert, James Anderson, determined the "average" by adjusting national and state averages through a process called "product-segment-adjustment analysis." In rebuttal, he presented a "Chicago section 3 standard" and a "Naperville standard." The Review Board declined to apply the latter two standards in addressing the section 12(c) factors. The protesting dealers' expert witness, John Matthews, calculated the "average" based on a "Chicago metro standard." Anderson's state and national standards showed the existing dealers in Jacobs' and Loren's relevant market area were significantly underperforming. Matthews' standard showed the dealers were only slightly underperforming, which he described as insignificant.

GMC and Loren allege the Review Board's decision is premised on a static market in that it took the poorly performing "average" of Chicago and treated that "average" as a static ceiling on the market.

We begin by noting GMC and Loren have not developed this argument sufficiently to permit our review of it. They do not cite where in

the Review Board's order that it adopted a static market, and due to the complexity of this case, specificity is warranted.

As stated, section 12(c) of the Franchise Act (815 ILCS 710/12(c) (West 2000)) contains 11 factors, and the Review Board made numerous factual findings. Further, it was GMC that established the "average" as the standard of performance. The "average" was then used in analyzing such things as existing dealer performance, sales opportunities per dealer in the relevant market area, GMC's current share of franchises in the area, sales effectiveness for the protesting dealers, and lost opportunities to competing brands within the relevant market area. Accordingly, GMC and Loren needed to specify where the Review Board adopted a static market.

Further, we note it appears GMC and Loren are simply attempting to recharacterize their argument that the Review Board's rejection of GMC's national and state standards is against the manifest weight of the evidence. Thus, we will address that issue next.

GMC and Loren allege the Review Board's reasoning for rejecting GMC's state and national standards of performance is against the manifest weight of the evidence.

■ In this case, the protesting dealers attacked Anderson's product-segment-adjustment analysis on numerous grounds and presented testimony and exhibits supporting their challenge. In rebuttal, GMC presented evidence to refute those challenges. In its closing brief, GMC raised the arguments it now asserts and the Review Board agreed with the protesting dealers. Thus, to the extent GMC is asking us to reweigh the evidence or to substitute our judgment for the Review Board's, we emphasize that is not our function as a reviewing court. See *Lester v. Department of Employment Security*, 354 Ill. App. 3d 51, 55, 819 N.E.2d 1143, 1147 (2004). As stated, we will only review the evidence to determine if the Review Board's factual findings were against the manifest weight of the evidence. See *Smith*, 150 Ill. App. 3d at 586, 502 N.E.2d at 44.

We begin our review by noting that while the Review Board's order criticized the product-segment-adjustment analysis because of import bias/influence, the Review Board concluded the analysis was flawed because of (1) lack of adequate product supply to local dealers and (2) distinctions between rural and metropolitan markets.

As to lack of adequate supply, the protesting dealers presented evidence that they were not receiving enough sport utility vehicles (SUVs), which were the most popular types of vehicles for their customers (76% of all sales for one dealership). They contended the short supply had a greater impact on them than the state or nation as a whole due to their large percentage of sales coming from the short-

supplied vehicle. The protesting dealers also presented evidence that their customers were highly selective about their vehicles. The dealers insisted they could sell more SUVs, not vehicles in general. Thus, this case is different from *Yamaha of Downers Grove, Inc. v. American Suzuki Motor Corp.*, No. 92—C—6385, slip order at 13-14 (N.D. Ill. September 30, 1994) (unpublished order) (1994 U.S. Dist. LEXIS 14057, at *13-14), where the dealer testified he could not get as many Suzuki motorcycles in general, not a specific kind of motorcycle, as he could sell. Here, the protesting dealers testified they requested more SUVs from GMC but their requests were ignored, and trades were difficult for popular vehicles. Further, the Review Board found GMC's "day-supply" data was unreliable because some of the data for the relevant years was missing or appeared obviously wrong. Accordingly, this case is distinguishable from *Doug Bigelow Chevrolet, Inc. v. General Motors Corp.*, Motor Vehicle Dealers Bd. of Ohio No. 97—1—MVDB—200—L/SS, at 29-30 (January 3, 2002), where adequate "day-supply" data was presented and it appears no large-percentage-of-sales argument as to short supply was raised.

Thus, we find the Review Board's conclusion Anderson's product-segment-adjustment analysis was flawed because it did not account for an inadequate product supply was not against the manifest weight of the evidence.

Regarding the metropolitan nature of the two relevant markets, the protesting dealers presented evidence they had significantly more interbrand competition (around 22 different brands) than rural areas. Additionally, seven of those brands had a much greater share of the Chicago market than they did nationwide. As to Jeep's and Lincoln-Mercury's above-average performance in the Chicago market, the protesting dealers provided other reasons that would explain the above-average performance despite the increased competition. Further, no evidence was presented that other metropolitan areas in Illinois had the same amount of competition as Chicago, and Chicago section 3 contained a large amount of rural area. Moreover, Naperville lacked intrabrand competition.

Accordingly, we also find the Review Board's conclusion the GMC's standards did not account for the metropolitan nature of the Chicago market was not against the manifest weight of the evidence.

GMC and Loren last assert the Franchise Act is unconstitutional because it (1) is vague, (2) does not ensure a prompt postdeprivation hearing, (3) conflicts with the commerce clause, (4) violates the Sherman Act (15 U.S.C. §§ 1 through 7 (2000)), and (5) is special legislation.

█ The Review Board contends GMC has forfeited all of its

constitutional arguments other than the vagueness challenge by failing to raise them before the Review Board. See *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278, 695 N.E.2d 481, 489 (1998) (noting issues not raised before the administrative agency are forfeited on administrative review). Despite an administrative agency's lack of authority to find a statute unconstitutional or to even question its validity, a litigant's right to challenge the constitutionality of a statute is still subject to forfeiture for failing to present it to the agency. *Texaco-Cities*, 182 Ill. 2d at 278, 695 N.E.2d at 489.

In this case, the record shows GMC did state the constitutional issues in its exceptions and objections to the hearing officer's proposed order but did not address them in its supporting brief. Citing Supreme Court Rule 341(e)(7) (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001), the Review Board asserts that was insufficient to preserve the issues for administrative review. We disagree, as Rule 341 applies specifically to briefs filed in reviewing courts, not administrative agencies. Accordingly, we find GMC and Loren have not forfeited their constitutional issues.

In deciding constitutionality arguments, all statutes are presumed constitutional, and the burden of rebutting that presumption is on the party challenging the statute's validity. If reasonably possible, courts must construe a statute so as to affirm its constitutionality and validity. *People v. Greco*, 204 Ill. 2d 400, 406, 790 N.E.2d 846, 851 (2003).

GMC and Loren assert the Franchise Act's good-cause standard is unconstitutionally vague.

■ A law violates the due-process clause "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03, 15 L. Ed. 2d 447, 450, 86 S. Ct. 518, 520-21 (1966); see also *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 425, 687 N.E.2d 1050, 1064 (1997) (stating a statute is unconstitutionally vague where a person of ordinary intelligence does not have fair notice that his or her conduct is forbidden by the statute). Further, the statute must provide explicit standards for those charged with its enforcement to prevent arbitrary and discriminatory enforcement, and its terms must serve as a guide for those who must comply with it. *In re Marriage of Chen*, 354 Ill. App. 3d 1004, 1020, 820 N.E.2d 1136, 1150 (2004).

■ As stated, section 2(v) of the Franchise Act defines "good cause" (815 ILCS 710/2(v) (West 2000)) and section 12(c) (815 ILCS 710/12(c) (West 2000)) sets forth 11 circumstances the court should consider in determining "good cause."

In addressing a similar issue related to the Franchise Act, the First District recognized administrative agencies must often resolve similar "cause" questions without further guidance from the underlying statute or regulation. *Ford Motor Co.*, 338 Ill. App. 3d at 889, 788 N.E.2d at 195. It further noted courts have upheld police regulations providing discipline or termination for cause against constitutional vagueness challenges because courts understand that it is difficult for an administrative agency (or the legislature) to anticipate every type of conduct that might constitute good cause. *Ford Motor Co.*, 338 Ill. App. 3d at 889, 788 N.E.2d at 195. For example, in *Arnett v. Kennedy*, 416 U.S. 134, 160, 40 L. Ed. 2d 15, 37, 94 S. Ct. 1633, 1647 (1974), the United States Supreme Court ruled a provision authorizing the discharge of federal civil service employees for " 'such cause as will promote the efficiency of the service' " was not void for vagueness even though it did not spell out in detail the proscribed conduct.

Moreover, in *Piano v. State ex rel. New Motor Vehicle Board*, 103 Cal. App. 3d 412, 417-22, 163 Cal. Rptr. 41, 44-46 (1980), a California appellate court rejected an argument that the good-cause standard contained in the California Automobile Franchise Act (California Act) (Cal. Veh. Code § 3063 (West 1980)), which contained only five circumstances to consider, was unconstitutionally vague. The court noted the standards set forth in that act were adequate to guide those persons to be governed by the provision. *Piano*, 103 Cal. App. 3d at 417, 163 Cal. Rptr. at 44.

GMC and Loren do not cite any cases where a "good-cause" standard was found unconstitutionally vague. See, *e.g.*, *Mike Naughton Ford, Inc. v. Ford Motor Co.*, 862 F. Supp. 264, 270-71 (D. Colo. 1994) (finding a statute unconstitutionally vague that prohibited that addition of an automobile franchise where such an addition was " 'inequitable to the existing dealer' "). The Franchise Act goes beyond merely stating "good cause" and provides more guidance than the above-cited cases that found a "cause" standard was not vague.

Accordingly, we find the Franchise Act's good-cause standard does not violate the due-process clause because of vagueness.

■ GMC and Loren also assert the Franchise Act is unconstitutional because it fails to provide for a prompt postdeprivation hearing in violation of their due-process rights. Specifically, they contend their right to contract for the establishment of a dealership is "a cognizable right worthy of due process protection as both property and liberty," and thus to comply with due process, the Franchise Act must mandate a prompt resolution.

In *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 106-08, 58 L. Ed. 2d 361, 373-75, 99 S. Ct. 403, 410-11 (1978), the Supreme

Court rejected a manufacturer's argument that the California Act deprived it of its liberty to pursue its lawful occupation without due process of law. Like the Franchise Act, the California Act required a manufacturer to give notice to existing dealerships in the relevant market area of its intention to establish an additional franchise and provided the existing dealerships with the right to file a protest. If such protest was filed, the manufacturer could not establish the additional franchise until a hearing was held to determine if good cause existed for the addition. *New Motor*, 439 U.S. at 98 n.1, 58 L. Ed. 2d at 369 n.1, 99 S. Ct. at 406 n.1, quoting Cal. Veh. Code § 3062 (West Supp. 1978).

The Supreme Court noted that even if the right to franchise was a protected interest before the enactment of the California Act, the legislature had the power to subordinate the automobile manufacturer's franchise rights to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices. *New Motor*, 439 U.S. at 106-07, 58 L. Ed. 2d at 374, 99 S. Ct. at 410-11. Thus, the manufacturer had no interest in franchising that was immune from state regulation. *New Motor*, 439 U.S. at 104-05, 58 L. Ed. 2d at 372, 99 S. Ct. at 409. Moreover, the legislature had the authority to protect the franchisees' rights through customary and reasonable procedural safeguards, which did not deprive the manufacturer of due process. *New Motor*, 439 U.S. at 107-08, 58 L. Ed. 2d at 374, 99 S. Ct. at 411. States can and do require businesses to secure regulatory approval before engaging in specified practices. See *New Motor*, 439 U.S. at 108, 58 L. Ed. 2d at 374-75, 99 S. Ct. at 411.

Here, the Franchise Act dictated if and when GMC obtained the right to contract for an additional franchise. See 815 ILCS 710/4(e)(8) (West 2000). The Illinois legislature had the authority to curtail GMC's right to contract and to establish procedural safeguards for existing dealers. See *New Motor*, 439 U.S. at 106-07, 58 L. Ed. 2d at 374, 99 S. Ct. at 410-11. Further, contrary to GMC and Loren's assertion, the *New Motor* Court did not address the time frames contained in the California Act in finding the act's procedural safeguards did not violate due process.

Accordingly, we find GMC and Loren did not have a protected right to franchise as the Illinois legislature had the authority to restrict that right and did so by enacting the Franchise Act.

Even if due process required a prompt hearing under the Franchise Act, GMC and Loren have not cited any cases where a court has found a statute facially unconstitutional because it did not provide for a prompt postsuspension hearing. In *Barry v. Barchi*, 443 U.S. 55, 66, 61 L. Ed. 2d 365, 376, 99 S. Ct. 2642, 2650 (1979), the Supreme Court

found the statute at issue there violated due process *as applied* in that case because the defendant did not receive a prompt postsuspension hearing. In *Aldana v. Holub*, 381 So. 2d 231, 238 (Fla. 1980), the statute did not involve a suspension of rights, and its rigid jurisdictional periods could not be remedied by enlarging them or permitting continuances or extensions of time since that would constitute a denial of *access to the courts* by creating a heavy prelitigation burden.

Further, GMC and Loren have not demonstrated a constitutional violation as applied to the facts of this case. Due process requires a "prompt postsuspension hearing *** that would proceed and be concluded without appreciable delay." *Barry*, 443 U.S. at 66, 61 L. Ed. 2d at 376, 99 S. Ct. at 2650. While GMC and Loren note the case began in early 2001 and the hearing lasted from May 2002 to December 2002, they point to no delays on the part of the Review Board. The record indicates that not all of the dealerships were notified of the proposed additional franchise until March 2001, and the Review Board held a settlement conference on April 16, 2001, at which the parties could not reach an agreement. The Review Board then set a September 10, 2001, hearing based on the availability of the parties, counsel, and expert witnesses. GMC agreed to all continuances of that hearing date. The hearing was lengthy due to the case's complexity and the amount of evidence, including around 200 exhibits and 18 witnesses.

■ As to the three-month delay between the hearing officer's recommendation and the final order, both parties filed exceptions to the hearing officer's findings and responses to the other party's exceptions. Then Loren filed a petition to intervene and adopt GMC's exceptions, to which the protesting dealers objected. The Review Board's final order was then filed within a week after Loren's petition was granted.

Accordingly, in this case, the record indicates the length of the proceedings stemmed from their thoroughness and the parties' actions. See *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547, 84 L. Ed. 2d 494, 507, 105 S. Ct. 1487, 1496 (1985) (holding complaint did not state a constitutional-deprivation claim where it showed nothing about the delay except that the delay was due in part to the proceedings' thoroughness). Thus, we find the Franchise Act did not violate the due-process clause as applied in this case.

GMC and Loren further argue the Franchise Act violates the commerce clause of the United States Constitution (U.S. Const., art. I, § 8, cl. 3).

■ Under the commerce clause, Congress has the power to enact legislation regulating interstate commerce. The United States

Supreme Court has interpreted the clause to also provide an implicit limitation upon state power even where Congress has not acted. Thus, the clause demands some aspects of trade must generally remain free of state interference, and thus a state regulation that ventures excessively into the regulation of one of these areas is invalid. *People v. Kesler*, 186 Ill. 2d 413, 416, 712 N.E.2d 341, 342 (1999). In *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 25 L. Ed. 2d 174, 178, 90 S. Ct. 844, 847 (1970), the Supreme Court enunciated the standard for determining the validity of a state statute challenged under the commerce clause as follows:

> "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation.] If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

■ As to whether the Franchise Act promotes a legitimate local public interest, we have already noted the Supreme Court's decision in *New Motor*, which addressed the California Act, which is similar to the Franchise Act. There, the Supreme Court recognized the legitimacy of state regulation of automobile manufacturers in establishing new franchises. See *American Motors Sales Corp. v. Division of Motor Vehicles*, 592 F.2d 219, 223 (4th Cir. 1979). It noted a disparity in the bargaining power between automobile manufacturers and their dealers existed, which led states to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by manufacturers. *New Motor*, 439 U.S. at 100-01, 58 L. Ed. 2d at 370, 99 S. Ct. at 407. Such laws also promoted fair dealing and protected small business. See *New Motor*, 439 U.S. at 102 n.7, 58 L. Ed. 2d at 371 n.7, 99 S. Ct. at 408 n.7. The *New Motor* Court found the California legislature had the power to subordinate the automobile manufacturer's franchise rights to the conflicting rights of its franchisees where necessary to prevent unfair or oppressive trade practices. *New Motor*, 439 U.S. at 106-07, 58 L. Ed. 2d at 374, 99 S. Ct. at 410-11.

In *American Motors*, 592 F.2d at 220-21, the Fourth Circuit addressed whether a Virginia statute that prohibited an automobile manufacturer from granting an additional franchise if the State Commissioner of Motor Vehicles determined the market would not support all of the dealerships (Va. Code Ann. § 46.1—547(d) (Supp. 1978)) violated the commerce clause. The court concluded the statute did

serve a legitimate public purpose, noting the statute served the same public interests identified in *New Motor*. *American Motors*, 592 F.2d at 223-24.

Like the act in *American Motors*, the Franchise Act serves the same public interests identified in *New Motor*. Section 1.1 of the Franchise Act (815 ILCS 710/1.1 (West 2000)) notes the regulations were warranted "to prevent frauds, impositions[,] and other abuses upon its citizens[;] to protect and preserve the investments and properties of the citizens of this State[;] and to provide adequate and sufficient service to consumers generally." Accordingly, we find the Franchise Act effectuates a legitimate local public interest.

Thus, this case is distinguishable from *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 530-31, 93 L. Ed. 865, 870, 69 S. Ct. 657, 661 (1949), where the only purpose of the statute was to curtail the volume of interstate commerce to aid local economic interests. Moreover, we note *General GMC Trucks, Inc. v. General Motors Corp.*, 239 Ga. 373, 377, 237 S.E.2d 194, 197 (1977), in which the Georgia Supreme Court found that state's Automobile Franchise Practices Act violated the commerce clause because it did not effectuate the public interest as it was purely anticompetitive, was decided before the Supreme Court's decision in *New Motor*.

Second, the Franchise Act does not distinguish between out-of-state and in-state manufacturers and thus regulates evenhandedly. This is different from *Buck v. Kuykendall*, 267 U.S. 307, 313, 69 L. Ed. 623, 625, 45 S. Ct. 324, 325 (1925), where the statute applied to common carriers engaged exclusively in interstate commerce.

Thus, we are left to determine whether the Franchise Act places a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 25 L. Ed. 2d at 178, 90 S. Ct. at 847. In finding that the Virginia statute did not impose such a burden, the Fourth Circuit noted that even with the statute, the manufacturer and its competitors can still supply the market area with all the vehicles it can absorb, and the public can still buy the manufacturer's brand from the existing dealership or choose to buy a competitive brand. *American Motors*, 592 F.2d at 223. It also noted that in addressing the antitrust issue in *New Motors*, the Supreme Court recognized the California Act did have an anticompetitive effect but noted that " ' "if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed." ' " *American Motors*, 592 F.2d at 224, quoting *New Motor*, 439 U.S. at 111, 58 L. Ed. 2d at 376-77, 99 S. Ct. at 412, quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 133, 57 L. Ed. 2d 91, 105, 98 S.

Ct. 2207, 2218 (1978). Thus, the Fourth Circuit noted something in addition to such a restraint on competition must be shown to establish an unconstitutional burden on interstate commerce, and there, no other effect than the restriction of intrabrand competition was demonstrated. *American Motors*, 592 F.2d at 224.

We agree with the *American Motors* analysis and find GMC and Loren have not demonstrated any other effect beyond a restriction on intrabrand competition. Thus, the Franchise Act does not place an excessive burden on interstate commerce. Accordingly, we conclude the Act does not violate the commerce clause.

■ GMC and Loren next assert the Franchise Act is barred by the Sherman Act. They recognize the Supreme Court in *New Motor* rejected the argument as to the California Act (*New Motor*, 439 U.S. at 109, 58 L. Ed. 2d at 376, 99 S. Ct. at 412), finding the statute fell under the state-action exemption, but assert *New Motor* is distinguishable because that Court (1) failed to address the second prong of the state-action requirement and (2) noted less than 1% of the protests were resolved against the manufacturer.

The state-action exemption to the Sherman Act was established by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 87 L. Ed. 315, 63 S. Ct. 307 (1943). Under *Parker*, the following two standards must be met: (1) the challenged provision must be " 'one clearly articulated and affirmatively expressed as state policy' " and (2) the state itself must " 'actively supervise[ ]' " the policy. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 63 L. Ed. 2d 233, 243, 100 S. Ct. 937, 943 (1980), quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 55 L. Ed. 2d 364, 381, 98 S. Ct. 1123, 1135 (1978).

While the *New Motor* Court did not expressly set forth the two standards and state how the California Act met both standards, the Court did find the California Act satisfied the state-action exemption of *Parker*. *New Motor*, 439 U.S. at 109, 58 L. Ed. 2d at 376, 99 S. Ct. at 412. Less than two years later, the Supreme Court in *California Retail*, 445 U.S. at 106 n.9, 63 L. Ed. 2d at 243 n.9, 100 S. Ct. at 943 n.9, did expressly state how the California Act fulfilled the second prong. It noted the state's comprehensive regulation scheme " 'displace[d] unfettered business freedom' " with its own power. *California Retail*, 445 U.S. at 106 n.9, 63 L. Ed. 2d at 243 n.9, 100 S. Ct. at 943 n.9, quoting *New Motor*, 439 U.S. at 109, 58 L. Ed. 2d at 376, 99 S. Ct. at 412. Further, we note the Supreme Court later, in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46 n.10, 85 L. Ed. 2d 24, 34 n.10, 105 S. Ct. 1713, 1720 n.10 (1985), noted it was likely the second *Parker* prong would not have to be met when the actor was a state agency.

Accordingly, we find the Supreme Court's failure to expressly address the second *Parker* prong does not render *New Motor* distinguishable from this case. As stated, the California Act, like the Franchise Act, only provided for a hearing when an existing dealership filed a protest. *New Motor*, 439 U.S. at 103, 58 L. Ed. 2d at 371-72, 99 S. Ct. at 408-09.

Additionally, the fact the *New Motor* Court noted that in California, only 1 of 117 protests had been sustained (*New Motor*, 439 U.S. at 110 n.14, 58 L. Ed. 2d at 376 n.14, 99 S. Ct. at 412 n.14) also does not render that case distinguishable from this one. Here, GMC and Loren have suggested throughout their brief that the Review Board's decision in this case is unique and contrary to its prior decisions. They also did not present any evidence the Review Board in Illinois has granted more protests than the California board.

Thus, we conclude the Franchise Act does not violate the Sherman Act.

■ GMC and Loren last assert the Franchise Act violates the Illinois Constitution's prohibition against special legislation (Ill. Const. 1970, art. IV, § 13), which provides as follows: "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination."

The special-legislation clause prohibits the legislature from conferring special rights, privileges, or immunity or imposing a specific burden on a specified portion of the population to the exclusion of others who are similarly situated. Stated differently, the clause prevents the legislature from creating arbitrary classifications that discriminate in favor of a selected group without a reasonable basis. However, it does not prohibit all legislative classifications. *Village of Chatham v. County of Sangamon*, 351 Ill. App. 3d 889, 898, 814 N.E.2d 216, 225 (2004). The constitutionality of a legislative classification is judged the same as an equal-protection challenge, and thus in this case, we apply the rational-basis test and determine whether the legislative classification at issue is rationally related to a legitimate state interest. See *Village of Chatham*, 351 Ill. App. 3d at 898-99, 814 N.E.2d at 225.

To satisfy the rational-basis test, the classification must first rest upon a rational difference of situation or condition existing in the persons or objects so classified. The classification must also bear a rational relationship to the evil to be remedied and the legislation's purpose. *Village of Chatham*, 351 Ill. App. 3d at 899, 814 N.E.2d at 225.

The party attacking the statute's validity must demonstrate the classification's unreasonableness or arbitrariness. Courts will presume

the legislative classifications are constitutionally valid, and any reasonable doubt will be resolved in favor of upholding the classification. *Village of Chatham*, 351 Ill. App. 3d at 899, 814 N.E.2d at 226.

In this case, GMC and Loren contend the Franchise Act grants existing dealerships a monopoly by prohibiting new dealerships and thus favors existing dealerships over franchisees in other industries to which the Franchise Act does not apply. It further asserts the only reason for the favorable treatment is the political power of the existing dealerships.

Assuming the Franchise Act does create a legislative classification favoring existing automobile dealerships, a unique disparity in the bargaining power between automobile manufacturers and their dealers exists. See *New Motor*, 439 U.S. at 100 n.4, 58 L. Ed. 2d at 370 n.4, 99 S. Ct. at 407 n.4. GMC and Loren have not presented any evidence that this disparity has changed over time. By prohibiting the addition of a new franchise where good cause does not exist, the Franchise Act protects the equities of existing dealers. See *New Motor*, 439 U.S. at 101-02, 58 L. Ed. 2d at 371, 99 S. Ct. at 408. Accordingly, we find GMC and Loren have not satisfied their burden of showing the classification is unreasonable.

Additionally, in *Fireside Chrysler-Plymouth, Mazda, Inc. v. Edgar*, 102 Ill. 2d 1, 464 N.E.2d 275 (1984), the Illinois Supreme Court considered a special-legislation challenge to a Sunday-closing law applicable only to automobile dealers. Despite the court's earlier decision that found a nearly identical Sunday-closing law violated the special-legislation clause (*Courtesy Motor Sales v. Ward*, 24 Ill. 2d 82, 179 N.E.2d 692 (1962)), it recognized that recent legislation, including the Franchise Act, demonstrated a legislative purpose to regulate certain aspects of the sale of automobiles in a manner different from other retailers. *Fireside*, 102 Ill. 2d at 6, 464 N.E.2d at 278. The court held the Sunday-closing law was part of that regulatory scheme and then found it did not violate the special-legislation clause. *Fireside*, 102 Ill. 2d at 6-7, 464 N.E.2d at 278. When our supreme court later struck down provisions of section 10a of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/10a (West 1996)) that treated victims defrauded by vehicle dealers differently as special legislation, it noted those provisions were not part of the legislative scheme recognized in *Fireside. Allen v. Woodfield Chevrolet, Inc.*, 208 Ill. 2d 12, 24, 802 N.E.2d 752, 760 (2003).

Thus, we find the Franchise Act does not violate the special-legislation clause.

GMC and Loren contend the Review Board erred in awarding attorney fees to the protesting dealers. Specifically, they assert (1) sec-

tion 13 of the Franchise Act (815 ILCS 710/13 (West 2000)) does not provide for an award of attorney fees in this case, (2) the hearing officer failed to advise them of the possibility of an award of attorney fees as required by section 1001.770(c)(6) of Title 92 of the Illinois Administrative Code (92 Ill. Adm. Code § 1001.770(c)(6) (Conway Greene CD-ROM April 2001)), and (3) section 13 of the Franchise Act is unconstitutional on its face and as applied in this case.

The Review Board contends the issue of attorney fees is not ripe for review. In their reply briefs, GMC and Loren have not challenged the Review Board's assertion.

Here, the Review Board awarded the protesting dealers attorney fees and costs to be determined at a later hearing. However, when a trial court has not entered a final order determining the amount of attorney fees and costs, the reviewing court has determined issues relating to such an award are not ripe for review. See *Rothert v. Rothert*, 109 Ill. App. 3d 911, 919, 441 N.E.2d 179, 184 (1982); see also *Buckingham Corp. v. Modern Liquors, Inc.*, 16 Ill. App. 3d 534, 540, 306 N.E.2d 655, 659 (1973).

In *Rothert*, 109 Ill. App. 3d at 918, 441 N.E.2d at 183, the trial court entered an order awarding the plaintiff reasonable attorney fees and costs but reserved determination of the amount of the award. Following our supreme court's decision in *Laterza v. Murray*, 2 Ill. 2d 219, 223, 117 N.E.2d 779, 782 (1954), this court found the issue of attorney fees was not reviewable since the amount of the award had not been determined. *Rothert*, 109 Ill. App. 3d at 918-19, 441 N.E.2d at 184.

Moreover, in *Buckingham Corp.*, 16 Ill. App. 3d at 539-40, 306 N.E.2d at 659, the defendant alleged the trial court erred in granting the plaintiff leave to file a petition for costs and attorney fees because no statutory authority existed for such an award. In finding the issue was not ripe for review, the reviewing court noted the trial court had not determined any rights since it had not entered a final judgment on the issue of costs and attorney fees. *Buckingham Corp.*, 16 Ill. App. 3d at 540, 306 N.E.2d at 659.

While the awarding entity in this case is an agency and not a trial court, a final determination of the parties' rights as to attorney fees has not been entered. The same issues that GMC and Loren raise in their briefs were raised by GMC in response to the protesting dealers' petition for attorney fees, and the Review Board has yet to address them or enter an amount of the award.

Additionally, the ripeness doctrine seeks to (1) prevent, by avoiding premature litigation, the courts from getting involved in abstract disagreements over administrative policies and (2) protect the

agencies from judicial interference until the agency has formalized an administrative decision, of which the challenging parties have felt the effects. *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381, 388, 639 N.E.2d 571, 574 (1994). As stated, the Review Board has yet to decide the issues raised by GMC and Loren, and thus GMC has not yet felt the effect of the Review Board's decision. Moreover, neither party has raised any potential hardships that would result from us withholding consideration at this time. See *National Marine*, 159 Ill. 2d at 389, 639 N.E.2d at 574 (noting ripeness can be addressed by examining (1) the fitness of the issues for a judicial decision and (2) the hardship to the parties of withholding court consideration).

■ Accordingly, we find the attorney-fees issues raised by GMC and Loren are not ripe for judicial review at this time. This includes the constitutional issue (despite the fact the Review Board cannot adjudicate the matter) since the Review Board's resolution of the other issues could deprive GMC of standing to raise the issue on administrative review. See *In re J.W.*, 346 Ill. App. 3d 1, 13, 804 N.E.2d 1094, 1104 (2004) (noting the doctrine of standing seeks to insure that issues are raised and argued only by those parties with a real interest in the controversy's outcome and thus requires the person raising the issue to have suffered or be in immediate danger of suffering a direct injury as a result of the challenged statute's enforcement). We note our decision does not in any way address the merits of the attorney-fees issues and is not a confirmation of the Review Board's "award of attorney fees and costs" in the September 2003 final order, as the Review Board's regulations provide such an award is to be made in a second final order in cases such as this (see 92 Ill. Adm. Code § 1001.770(e)(3)(F) (Conway Greene CD-ROM April 2001)).

For the reasons stated, we vacate the circuit court's ruling on the attorney-fees issues; affirm the circuit court's judgment, which confirmed the Review Board's decision, in all other respects; and remand the cause to the Review Board to address the attorney-fees issues.

Affirmed in part and vacated in part; cause remanded.

JUSTICE STEIGMANN, specially concurring:

I agree with both the reasoning and the result reached in the majority opinion in this case, but I write separately because of the concerns expressed by my distinguished colleague in dissent. I share many of those concerns, particularly about the inconsistencies in the Franchise Act and the problems it creates in a free-market society.

Nonetheless, despite concerns about the wisdom of the Franchise Act, which the dissent expresses well, neither the wisdom nor the desirability of that legislation is subject to review by this court. "Our role in evaluating the [statute] at issue here is necessarily limited, for we are not called upon to determine whether the legislature has chosen the best or most effective means of resolving the problems addressed in this legislation." *People v. Lantz*, 186 Ill. 2d 243, 254, 712 N.E.2d 314, 319 (1999); see also *Serio v. Hevesi*, 9 Misc. 3d 835, 836, 804 N.Y.S.2d 571, 574 (N.Y. Sup. 2005) ("[T]he role of the judiciary is limited to enforcing statutes and ruling on challenges to their constitutionality [citation]. The judiciary does not sit as a superlegislature empowered to weigh the wisdom, reasonableness[,] or desirability of legislation"); *Mayor of City of Lansing v. Michigan Public Service Comm'n*, 470 Mich. 154, 161, 680 N.W.2d 840, 844 (2004) (the task of the judiciary is the important yet limited one of reading into and interpreting what the legislature has made the law. "[The] [l]egislature is free to make policy choices that, especially in controversial matters, some observers will inevitably think unwise. This dispute over the wisdom of a law, however, cannot give warrant to a court to overrule the people's [l]egislature").

PRESIDING JUSTICE COOK, dissenting:

I respectfully dissent.

Plaintiff General Motors Corporation decided to add a GMC franchise at Jacobs Twin Buick on Chicago's west side and another at Loren Pontiac-Buick in Glenview. In February and March 2001, pursuant to the Franchise Act (815 ILCS 710/1 through 32 (West 2000)), General Motors notified its existing franchisees in the 10-mile relevant market area of its intention to grant the additional franchises. 815 ILCS 710/4(e)(8) (West 2000) ("notice"); 815 ILCS 710/2(q) (West 2000) ("relevant market area"). Defendants Grossinger Autoplex, Inc., Castle Buick-Pontiac, Inc., North Shore, Inc., d/b/a/ Muller Pontiac/GMC Mazda, and Joe Mitchell Buick/GMC Truck, Inc., protested the Loren add point. Defendants Grossinger and Castle also protested the Jacobs add point.

Pursuant to the Franchise Act, the State of Illinois Motor Vehicle Review Board commenced a hearing on May 20, 2002. The hearing concluded December 13, 2002. On May 28, 2003, the hearing officer entered his 97-page findings of fact, conclusions of law, and recommended decision, recommending the protests be upheld and the additional GMC franchises not be allowed. The Review Board adopted that recommendation on September 3, 2003. The circuit court affirmed the Board's final order July 20, 2004, and General Motors appealed.

# I. BACKGROUND

Under the Franchise Act, when a protest is filed with the Review Board, "[t]he manufacturer shall have the burden of proof to establish that good cause exists to allow the grant or establishment of the additional or relocated franchise." 815 ILCS 710/4(e)(8) (West 2000). " 'Good cause' means facts establishing commercial reasonableness in lawful or privileged competition and business practices as defined at common law." 815 ILCS 710/2(v) (West 2002). The Franchise Act requires the Board to consider all relevant circumstances in determining good cause, including but not limited to economic and marketing conditions, the investment of the objecting dealers, the public welfare, and the effect upon existing motor vehicle dealers. 815 ILCS 710/12(c) (West 2000). One of the relevant circumstances is whether the objecting dealers "have adequate motor vehicle sales and service facilities *** provided, however, that good cause shall not be shown solely by a desire for further market penetration." 815 ILCS 710/12(c)(7) (West 2000).

There are inconsistencies in the Franchise Act. See *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 478, 645 N.E.2d 946, 954 (1994). How can you protect the private economic interests of dealers without destroying competition and frustrating consumers' interests in lower prices and better service? *Fields*, 163 Ill. 2d at 478, 645 N.E.2d at 954.

Motor vehicle franchise acts are controversial. They were justified on the basis of a "disparity in bargaining power between automobile manufacturers and their dealers." *New Motor*, 439 U.S. at 100, 58 L. Ed. 2d at 370, 99 S. Ct. at 407.

> " 'Automobile production is one of the most highly concentrated industries in the United States, a matter of grave concern to officers of the Government charged with enforcement of the antitrust laws. Today there exist only 5 passenger-car manufacturers, 3 of which produce in excess of 95 percent of all passenger cars sold in the United States.' " *New Motor*, 439 U.S. at 100 n.4, 58 L. Ed. 2d at 370 n.4, 99 S. Ct. at 407 n.4, quoting S. Rep. No. 84–2073, at 2 (1956).

We now live in a world of franchises. Motor vehicle dealers are given special treatment not enjoyed by other franchisees, who must protect themselves by the contracts they sign. Motor vehicle manufacturers from around the world now compete in the United States. New manufacturers can put dealers wherever they want them. Established manufacturers, such as General Motors, cannot.

Motor dealer franchise laws create problems. Even frivolous protests can take years to resolve. *Yamaha Motor Corp. v. Jim's*

*Motorcycle, Inc.*, 401 F.3d 560, 566 (4th Cir. 2005). The process is unpredictable because the standards for granting a protest are " 'highly subjective' " and " 'remarkably vague.' " *Yamaha Motor*, 401 F.3d at 566. These problems result in fewer new dealers and a reduction in intrabrand and interbrand competition, which " '[a]s a matter of economic theory[,] *** lead[s] to higher prices for consumers.' " *Yamaha Motor*, 401 F.3d at 566, quoting *Yamaha Motor Corp., U.S.A. v. Smit*, 276 F. Supp. 2d 490, 503 (E.D. Va. 2003). The Fourth Circuit held the Virginia Motor Dealer Franchise Law unconstitutional under the dormant commerce clause, the application of the clause in the absence of congressional action. *Yamaha Motor*, 401 F.3d at 574. Franchise acts must be applied carefully if their constitutionality is to be sustained.

General Motors' expert, James Anderson, testified there were 73 different GMC market areas in Illinois. Of those 73 areas, 47 met or exceeded their particular adjusted national standard. The Loren and Jacobs relevant market areas, however, performed near the bottom of the 73 Illinois rankings. The Chicago metropolitan area has experienced tremendous growth in the light-truck market over the past decade in a large and expanding market of several million people. Anderson testified that the Jacobs relevant market area had the highest opportunity per dealer of any market in the state and the Loren relevant market area had the next highest. Anderson testified that tremendous opportunity existed in these areas and that "these markets have simply outgrown the ability of the now current GMC dealer networks to serve [them]." Anderson also testified that GMC franchises made up only 2.4% of total franchises in the Jacobs relevant market area and 3.1% in the Loren relevant market area. The national percentage of GMC franchises to other franchises, however, was 6.0%.

Anderson examined other areas as well. General Motors' franchise agreements refer to areas of primary responsibility (APRs), which are shared by many dealers. The Jacobs add point falls within the "section 1" APR, and the Loren add point falls within the "section 2" APR. General Motors' APRs are then divided into areas of geographic sales and service advantage (AGSSAs) for each dealer within the APR. Anderson concluded there was underperformance in these APRs and AGSSAs as well. The objecting dealers' expert, John Matthews, instead of comparing the two relevant market areas to the entire state and to the nation, compared them to a "Chicago Metro" area, which excluded the two relevant market areas. Even using this approach, the two relevant market areas were not performing adequately. General Motors argued that the entire Chicago Metro area was underperforming and it was a mistake to compare Chicago against itself.

The Review Board found that Anderson's conclusion that the low number of outlets accounts for GMC's poor performance "makes sense on its face." However, the Review Board concluded that Anderson's analysis was "not perfect." The Review Board complained that Anderson's testimony did not account for (1) a possible local preference in the Chicago area for imports, (2) dealer complaints that they were not receiving a sufficient supply of high-demand product lines, and (3) distinctions between rural and metropolitan areas of the state. The Review Board concluded that these factors "may skew the national penetration percentages unfavorably against local GMC dealers."

The Review Board recognized that it did not automatically follow that adding new dealers would hurt existing dealers. Increased presence could increase sales without taking them away from existing dealers. The Review Board was not persuaded, however, that it would make much difference to a potential GMC purchaser whether he had to travel 5.1 miles or 2.9 miles to find a GMC dealer. The Review Board also noted that if the Jacobs relevant market area was 11 miles instead of 10 miles, we would go from 3 existing dealers to 7.

The Review Board found that Matthews' standard was at least comparable to Anderson's, and Matthews found only a very insignificant shortfall in the relevant market areas under review. The Review Board accordingly found that the two add points were not warranted by economic and marketing conditions, that there was insufficient evidence the local dealers were failing to adequately perform, that the objecting dealers had invested millions of dollars in their facilities, that the benefit of being a mile or two closer to the nearest GMC dealer is incremental at best, and addition of the add points would hurt the existing dealers in the 10-mile relevant market areas.

## II. ANALYSIS

An administrative agency's findings and conclusions on questions of fact are deemed to be *prima facie* true and correct. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204, 692 N.E.2d 295, 302 (1998). A reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. An administrative agency's factual determinations are contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident. *City of Belvidere*, 181 Ill. 2d at 204, 692 N.E.2d at 302. An administrative agency's findings on a question of law, on the other hand, are reviewed with less deference. A court reviews such determinations on a *de novo* basis. As such, an agency's decision on a question of law is not binding on a reviewing court. *City of Belvidere*,

181 Ill. 2d at 205, 692 N.E.2d at 302. Where the case involves a mixed question of fact and law, a clearly erroneous standard of review is appropriate. Such a standard is between a manifest-weight-of-the-evidence standard and a *de novo* standard so as to provide some deference to the Board's experience and expertise. *City of Belvidere*, 181 Ill. 2d at 205, 692 N.E.2d at 302.

The Review Board did not apply the correct legal standard in this case. General Motors was not required to prove, to the Board's satisfaction, that the Chicago GMC dealers were underperforming. General Motors was only required to prove that it was acting reasonably in adding the two dealerships. "Good cause" means "commercial reasonableness in lawful or privileged competition." 815 ILCS 710(2)(v) (West 2000). Even if General Motors, in the Review Board's view, was making a mistake, it was still acting reasonably. Competition involves the taking of risks, the making of predictions at a time when facts are uncertain. "[T]he [Franchise Act] does not protect a dealer from fair, commercially reasonable competition. The public interest is not served by keeping dealers secure from financial loss occasioned by fair competition." *Jack Wolf*, Ill. Motor Vehicle Review Bd. at 18. Generally speaking, when competition is increased, lower prices and better service are a result of this increased competition. *In re Application of General Motors Corp.*, 232 Neb. 11, 19, 439 N.W.2d 453, 458-59 (1989).

If the Review Board had decided that General Motors was not acting in a commercially reasonable manner, that decision would have been contrary to the manifest weight of the evidence (or clearly erroneous). General Motors' decision was clearly a reasonable one. The two relevant market areas were performing near the bottom of the Illinois franchises. They were performing below the national average. General Motors was not required to accept the argument of the objecting dealers that "Chicago is different." The evidence was that light trucks and SUVs are no longer found only in rural America; these vehicles have caught on even in the big cities. General Motors has fewer franchises in the Chicago area, in comparison to other manufacturers, than it does nationally. General Motors did not have to sit back and accept that.

Given the applicable legal standard, it is unusual for the Review Board to second-guess a manufacturer's decision to add a dealership. *Jack Wolf*, Ill. Motor Vehicle Review Bd. at 20 (finding good cause for relocation); *Southwest Jeep-Eagle*, Ill. Motor Vehicle Review Bd. at 6 (finding good cause for additional dealership). This decision appears to be the first in Illinois to do so. Why would a manufacturer add a dealership unless there was a commercial reason to do so?

Certainly a manufacturer is not allowed to maliciously harm an existing dealer, but there is no evidence of that here. *Jack Wolf*, Ill. Motor Vehicle Review Bd. at 18 (not a predatory move); *Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp.*, 341 Ill. App. 3d 438, 446, 792 N.E.2d 488, 494 (2003) (a demand is not "coercion" unless it is commercially unreasonable behavior). "Commercial reasonableness" means actions taken reasonably and with proper motive, and not arbitrarily or capriciously. *Ford Motor Co.*, 338 Ill. App. 3d at 890-91, 788 N.E.2d at 196. Defendants point to the language that "good cause shall not be shown solely by a desire for further market penetration." 815 ILCS 710/12(c)(7) (West 2000). There is more than a bare desire for market penetration here. General Motors thinks it will make more money if it has more GMC dealerships. General Motors thinks it will provide better customer service if it has more GMC dealerships.

Should General Motors be persuaded by the Board's arguments that adding these two franchises will not do it any good? First, there was certainly evidence that although imports do well in the Chicago area, domestic products other than GMC also do very well. Anderson testified that he made adjustments to his calculations to recognize the Chicago area's unique features. Second, dealer complaints that they are not receiving enough of a "hot" item are common. *Yamaha Motor*, 401 F.3d at 568. General Motors cannot be expected to abandon its national allocation system to favor Chicago dealers on these "hot" items. When an item is in great demand, every dealer in the country wants more than it is receiving. General Motors is entitled, however, to Chicago dealerships that sell a reasonable amount of its products across the board. Finally, light trucks and SUVs are increasingly popular in the large cities. It was a mistake for the Review Board to refuse to consider how poor the sales of GMC products were in the two Chicago relevant market areas in comparison to the rest of the state.

Section 13 of the Franchise Act provides dealers with two causes of action. A dealer who suffers loss of money or property because of a manufacturer's "unfair method of competition or an unfair or deceptive act or practice declared unlawful by this Act may bring an action for damages and equitable relief." 815 ILCS 710/13 (West 2000). A dealer who has not suffered loss of money or property may still obtain equitable relief for such "an unfair act or practice." 815 ILCS 710/13 (West 2000). Where the dealer substantially prevails, attorney fees shall be awarded and costs assessed. 815 ILCS 710/13 (West 2000). Attorney fees were improperly awarded in this case. This was not an action for damages or injunctive relief. No finding was made that General

Motors was guilty of "an unfair method of competition or an unfair or deceptive act or practice declared unlawful by this Act." 815 ILCS 710/13 (West 2000).