FORD MOTOR COMPANY, Plaintiff-Appellant, v. THE MOTOR VEHICLE REVIEW BOARD *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—01—2475

Opinion filed March 28, 2003.

---

Berkowitz, Feldmiller, Stanton, Brandt, Williams & Shaw, L.L.P., of Kansas City, Missouri (Kurt D. Williams, of counsel), and Hinshaw & Culbertson, of Chicago (Timothy G. Shelton, of counsel), for appellant.

Boyle & Leyhane, Ltd. (Francis J. Leyhane III, of counsel), and James J. Roche & Associates (James J. Roche and Michaela S. Stapleton-Corcoran, of counsel), for appellees.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff Ford Motor Company (Ford) appeals an order of the circuit court of Cook County in administrative review, affirming the decision of the defendant Motor Vehicle Review Board that Ford did

not have good cause to terminate its Ford sales and service agreement (Agreement) with Village Ford Sales, Inc. (Village Ford).

The record on appeal discloses that in March 1984, Ford and Village Ford entered into the Agreement, which sets forth various new sales, parts sales and personnel obligations that Village Ford was required to meet as a dealer for Ford. The Agreement allowed for either party thereto to terminate the relationship under a variety of circumstances, including a failure to meet the new sales, parts sales and personnel obligations. The Agreement also provided that any protest or claim by Village Ford with respect to termination of the Agreement by Ford shall be appealed to Ford's policy board (the Policy Board) within 15 days of notice of termination as a condition precedent to Village Ford's right to pursue any other remedy under the Agreement or the law. The Agreement further provided that the Policy Board's decisions were binding on Ford, but not on Village Ford.

The Agreement also appears to have been amended from time to time. Some of these amendments appear to be amendments to the basic form Agreement that were implemented by Ford prior to the relationship with Village Ford. On at least two occasions, amendments were signed by the president of Village Ford. In other cases, Ford waived formal acceptance on the ground that the amendment worked to the benefit of Village Ford.

Ford assigned Village Ford a "primary market area" (PMA), which is a geographical grouping of census tracts designating the dealership's main sales territory. In developing PMAs for its dealerships, Ford is supposed to consider: the proximity of each tract to actual dealer locations; natural and man-made barriers that would tend to restrain customers in a tract from going elsewhere for Ford service and products, such as rivers and freeway systems; traffic flow between the tract and the dealership; sales patterns of other Ford dealers; and trading habits of people in the tract. Village Ford consistently took issue with being assigned to a PMA within the Chicago multiple-point region, as all other dealerships in Will County were assigned to single-point markets with less stringent sales requirements.

In 1986, Ford began encouraging Village Ford to relocate from Romeoville to the Bolingbrook area, due to expected growth in that area, including an auto mall. Ford suggested a relocation site that already had four foreign car dealerships and a Chevrolet dealership in the area; Buick and Toyota dealerships were anticipated to move into this area also. In July 1989, due in part to Ford's promises of assistance with advertising and lease payments, Village Ford relocated to Bolingbrook. This location is at an intersection with I-55, but is not visible from I-55.

In 1990, Village Ford had its best year, with 13.1% market penetration. In September 1990, the 135th Street Bridge, which spanned the Illinois River and connected the north and south portions of the PMA, was removed and never replaced. The auto mall never materialized; four of the dealerships in the area relocated. The area took on an industrial character. Retail traffic patterns shifted to developments north of I-55. Village Ford, which sold 713 new cars in 1990, sold only 353 new cars in 1998. However, in 1998 Village Ford ranked in the top 15% of total sales in the Chicago region, ranking 45th out of 322 dealerships.

Ford first notified Village Ford of its concerns regarding deficiencies in vehicle sales, parts sales and personnel in November 1992. Further letters followed in January and July 1996, and January, July and October 1997, notifying Village Ford of the deficiencies and giving Village Ford an opportunity to cure them. Village Ford also corresponded with Ford during this period, seeking explanations and assistance to meet Ford's numerical goals. Village Ford also communicated its concerns regarding the designation of its PMA, its location, and the changing nature of the area. Village Ford requested relocation to a more modern facility north of I-55, but Ford denied these requests because a study commissioned by Village Ford, while noting problems with the current location, described the location as adequate.

In June 1998, Village Ford sent Ford a package of materials detailing its concerns and again requesting relocation and the opportunity to build a new facility. Ford agreed, on the condition that Village Ford enter into a limited two-year agreement with Ford under which the dealership would be sold if the sales targets were not met. Village Ford's owner declined to invest in a new facility under that condition.

On April 23, 1999, Ford sent Village Ford a notice of termination, citing below average car and truck retail shares in 1996, 1997 and 1998 as the basis for the termination. The notice also reminded Village Ford that Ford had established a Policy Board to review termination decisions and that a request for review had to be submitted in writing within 15 days of the receipt of the notice. Village Ford did not submit a request for review to the Policy Board.

Village Ford filed a notice of protest with the Motor Vehicle Review Board, stamped as received on May 10, 1999, claiming that Ford lacked good cause to terminate the Agreement. The Motor Vehicle Review Board sent notice to Ford on May 14, 1999. Following preliminary motions and hearings on the matter, a hearing officer for the Motor Vehicle Review Board issued a recommended decision in favor of Village Ford on September 29, 2000. The Motor Vehicle Review Board

adopted that decision and granted Village Ford's protest on November 17, 2000.

On December 18, 2000, Ford filed a complaint for administrative review by the circuit court of Cook County. The circuit court affirmed the decision of the Motor Vehicle Review Board in an order dated June 20, 2001. Ford filed a timely notice of appeal to this court.

## I

■ Initially, Ford purports to raise a question of jurisdiction. Ford contends that the Motor Vehicle Review Board "acted beyond its jurisdiction" in applying a common law standard of "good cause" in this case, instead of the factors set forth in the Illinois Motor Vehicle Franchise Act (Act) (815 ILCS 710/1 *et seq.* (West 2000)). However, the question of whether the Motor Vehicle Review Board had jurisdiction differs from the question of whether it erred in the standard it applied. See, *e.g.*, *In re Marriage of Mitchell*, 181 Ill. 2d 169, 692 N.E.2d 281 (1998). It is true that an administrative agency is a statutory creature with no general or common law power and is powerless to act unless statutory authority exists. See *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 530, 759 N.E.2d 509, 519 (2001). However, Ford has not argued that the Motor Vehicle Review Board lacked personal jurisdiction over the parties, or lacks the power generally to make good cause determinations under the Act. Rather, Ford raises questions regarding the retroactive application of the Act in this case.

■ Issues involving the retroactive application of the Act are constitutional in nature. A court should avoid constitutional issues, unless addressing them is necessary to dispose of a case. See, *e.g.*, *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189*, 178 Ill. 2d 399, 408, 687 N.E.2d 1050, 1056-57 (1997). Accordingly, this court will turn to address a nonconstitutional threshold issue raised by Ford in this appeal.

## II

Ford next argues that the Motor Vehicle Review Board should have dismissed Village Ford's protest because Village Ford failed to comply with the condition precedent in the Agreement requiring that such disputes be reviewed in the first instance by Ford's Policy Board. Ford correctly notes that a similar condition precedent was enforced in Illinois in the context of a construction contract requiring disputes be submitted in the first instance to the architect. *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 619 N.E.2d 144 (1993). Ford also notes that the United States Court of Appeals for the Seventh Circuit enforced a mediation clause identical to that in the Agreement here in *DeValk Lincoln Mercury,*

*Inc. v. Ford Motor Co.*, 811 F.2d 326, 336 (7th Cir. 1986), albeit applying Michigan law.

Ford overlooks, however, that in *DeValk Lincoln Mercury, Inc.*, the dealership brought a suit alleging "violations of the Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221 *et seq.* (1982), breach of contract, breach of fiduciary duty, and fraud." *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d at 328. *DeValk Lincoln Mercury, Inc.* did not involve a claim under the Act. Nor did *Mayfair Construction Co.* involve a claim under the Act.

■ Section 7 of the Act has always barred the imposition of unreasonable restrictions on the motor vehicle dealer or franchisee's assertion of legal and equitable rights. Ill. Rev. Stat. 1985, ch. 121½, par. 757; 815 ILCS 710/7 (West 2000). The Act has always contemplated that termination disputes be resolved by arbitration or judicial proceedings as provided for in section 12 of the Act. Ill. Rev. Stat. 1985, ch. 121½, par. 762(a), (b); 815 ILCS 710/12(a), (b) (West 2000). The question is whether the mediation clause in the Agreement merely supplements the protections afforded by the Act or constitutes an unreasonable restriction on the motor vehicle dealer's rights in violation of the Act.

■ Although Ford claims that its procedures ensure that the mediators are not biased in favor of Ford, the Policy Board's procedures conflict with the procedure for alternative dispute resolution set forth in the Act. Moreover, the 15-day time limitation imposed by the Agreement's mediation clause is more strict than the 30-day and 60-day time limitations set forth for arbitration or judicial proceedings under the Act, respectively. Thus, even though the Policy Board's decision would not bind Village Ford, the mediation clause does not appear to merely supplement the protections of the Act. By fostering multiple hearings in multiple forums, increasing the costs to the contracting parties, and unnecessarily extending the time consumed in resolving the controversy, enforcing the mediation clause would conflict with the general goals of alternative dispute resolution, and thus would conflict with the method of alternative dispute resolution set forth in the Act. See *Fireman's Fund Insurance Cos. v. Bugailiskis*, 278 Ill. App. 3d 19, 22-23, 662 N.E.2d 555, 557-58, (1996). Thus, the Motor Vehicle Review Board did not err in refusing to dismiss the protest in this case. Accordingly, this court must turn to address Ford's constitutional arguments.

## III

Ford's argument regarding the retroactive application of the Act relies greatly on the history of the Act. It is useful, therefore, to briefly review that history here.

Ford notes that section 4 of the Act, as it existed in 1984, prohibited the termination of a franchise or selling agreement without "good cause." Ill. Rev. Stat. 1989, ch. 121½, par. 754(d)(6). Section 12 of the Act, as it existed in 1984, provided for the resolution of termination disputes by certain types of arbitration agreements between the parties or by the courts. See Ill. Rev. Stat. 1989, ch. 121½, par. 762. Courts or arbitration panels were supposed to consider 10 statutory factors in determining whether a company had "good cause" to terminate a franchise or selling agreement. Ill. Rev. Stat. 1989, ch. 121½, par. 762(c).

However, in *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 645 N.E.2d 946 (1994), our supreme court held that section 4(e)(8), which provided that a manufacturer could not establish an additional dealership in the relevant market area of an existing dealer or dealers of the same line, unless the arbitrators or court determined that there was good cause for permitting it, and section 12(c) of the Act were unconstitutional. Our supreme court held that the General Assembly had impermissibly delegated for judicial examination matters (including determinations of the "public interest") that are for legislative or administrative determination, in violation of the separation of powers clause of the Illinois Constitution. *Fields Jeep-Eagle, Inc.*, 163 Ill. 2d at 479, 645 N.E.2d at 954. The court did not reach the issue of whether section 12(c) was unconstitutionally vague on its face. *Fields Jeep-Eagle, Inc.*, 163 Ill. 2d at 479, 645 N.E.2d at 954.

In 1995, after the *Fields Jeep-Eagle, Inc.* decision, the General Assembly amended the Act, creating the Motor Vehicle Review Board, empowering it to hear termination disputes and make "good cause" determinations. See 815 ILCS 710/12(b), (d), 16 (West 2000). Ford argues that when section 12(c) of the Act was struck down, it was as though it never existed. See *Northern Illinois Home Builders Ass'n v. County of Du Page*, 165 Ill. 2d 25, 36, 649 N.E.2d 384, 390 (1995). Accordingly, Ford concludes that there were no statutory standards for assessing "good cause."

Ford argues that the Motor Vehicle Review Board was powerless to act unless statutory authority existed. See *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 530, 759 N.E.2d 509, 519 (2001). Ford also argues that it would be unconstitutional to retroactively apply the statutory factors now found in section 12(d) of the Act. We address each contention in turn.

■ If the legislature has clearly indicated what the temporal reach of an amended statute should be, then, absent a constitutional prohibition, that legislative intent must be given effect; however, when the legislature has not so indicated, the court must determine whether ap-

plying the statute would have a retroactive impact, *i.e.*, " 'whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.' " *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 38, 749 N.E.2d 964, 971 (2001), quoting and adopting *Landgraf v. USI Film Products*, 511 U.S. 244, 280, 128 L. Ed. 2d 229, 261-62, 114 S. Ct. 1483, 1505 (1994). Ford argues that application of the Act would have a retroactive impact because its rights "vested" when it entered into the Agreement with Village Ford in 1984, though no later than 1990, the year of the last amendment of the Agreement. See *McAleer Buick-Pontiac Co. v. General Motors Corp.*, 95 Ill. App. 3d 111, 113, 419 N.E.2d 608, 610 (1981).

■ However, the *McAleer* court rejected retroactive application of the Act because:

> "At the time this franchise agreement was entered, there was no statute forbidding nonrenewal of it without showing good cause. Nor was there case law to that effect. Although McAleer has cited some cases requiring good faith for termination of a contractual relationship (*e.g.*, *Bishop v. Bloomington Canning Co.* (1923), 307 Ill. 179, 138 N.E. 597), these cases cannot be viewed as requiring good cause for nonrenewal of an agreement. Thus, when GMC and McAleer entered this agreement, each party acquired the right to refuse to renew it without showing good cause. To require GMC to make such a showing would impose a new duty in respect of a transaction already past and would therefore constitute a retroactive application of the Illinois Motor Vehicle Franchise Act." (Emphasis omitted.) *McAleer*, 95 Ill. App. 3d at 113, 419 N.E.2d at 610.

Thus, *McAleer* is distinguishable on its face, as this case does involve termination of an agreement. In addition, in *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 466 N.E.2d 958 (1984), a case cited in Ford's brief, this court held that under the implied covenant of good faith that exists in all contracts, a franchisor may not terminate a franchise agreement except where good cause exists. *Dayan*, 125 Ill. App. 3d at 992-93, 466 N.E.2d at 973. The *Dayan* court noted that "the test used by most courts in defining good cause seems to center on a determination of commercial reasonability." *Dayan*, 125 Ill. App. 3d at 993, 466 N.E.2d at 973. Thus, there was case law on point, further distinguishing this case from *McAleer*.

In this case, when Ford entered into the Agreement, Ford did not have a vested right to terminate that Agreement without good cause. However, the concept of "good cause" as discussed in *Dayan* is not identical to "good cause" as it was defined by section 12(c) the Act.

The statutory amendments creating the Motor Vehicle Review Board and empowering it to decide termination disputes in general may be applied retroactively, as they are merely procedural, and no vested rights are involved on that point. *Commonwealth Edison Co.*, 196 Ill. 2d at 35, 749 N.E.2d at 969. Moreover, in addition to the case law, section 4(d)(6) of the original Act differed from section 4(e)(8) (which was struck down in *Fields Jeep-Eagle, Inc.*), as section 4(d)(6) did not expressly require a court or arbitrators to apply the concept of "good cause" found in section 12 of the Act. See Ill. Rev. Stat. 1985, ch. 121½, par. 754(d)(6).

Ford argues that applying a standard of "good cause" not defined in the Act was beyond the statutory authority granted to the Motor Vehicle Review Board and violated the constitutional separation of powers. Ford is essentially arguing the inverse of *Fields Jeep-Eagle, Inc.*: if courts cannot apply legislative or administrative concepts of "good cause," then an administrative body cannot apply judicial concepts of "good cause." Ford argues that "the application of the rules and principles of the common law, among others, are inherently judicial functions." *People v. Bruner*, 343 Ill. 146, 158, 175 N.E. 400, 405 (1931).

*Bruner* predates our current constitution and involved a statute purporting to make jurors judges of the law as well as fact, not the function of an administrative body. Under the Illinois Constitution of 1970, the legislature may authorize an administrative agency to act in a quasi-judicial role without offending the separation of powers principle. *E.g.*, *City of Waukegan v. Pollution Control Board*, 57 Ill. 2d 170, 181-82, 311 N.E.2d 146, 152 (1974). The delegation to agencies of the quasi-judicial power to adjudicate rights must include an opportunity for judicial review of the administrative action. *City of Waukegan*, 57 Ill. 2d at 181-82, 311 N.E.2d at 152.

Of course, if adequate standards and guidelines are not set forth by the legislature, the legislative provision authorizing the exercise of discretion will run afoul of the separation of powers principle. See *City of Waukegan*, 57 Ill. 2d at 182, 311 N.E.2d at 152. Yet Ford's argument fails to recognize that administrative bodies are often tasked with resolving similar questions of "cause" without further guidance in the underlying statute or regulation. This court and other courts have upheld police regulations providing discipline or termination for cause against constitutional vagueness challenges precisely because courts understand that it is difficult for an administrative body (or, for that matter, a legislature) to anticipate every type of conduct that might constitute good cause. See, *e.g.*, *Everly v. Chicago Police Board*, 119 Ill. App. 3d 631, 638-39, 456 N.E.2d 992, 997 (1983) (and cases cited

therein). The fact of this appeal shows that the decision is subject to judicial review.

The remaining question is whether the Motor Vehicle Review Board erred in applying the standard of commercial reasonableness instead of the statutory factors in section 12(d) of the amended Act. Section 12(d) requires the Motor Vehicle Review Board to consider all relevant factors, including, but not limited to, whether termination would be "injurious to the public interest." 815 ILCS 710/12(d)(4) (West 2000). That factor is of the sort that our supreme court ruled could not be delegated to a court in *Fields Jeep-Eagle, Inc.* Consequently, section 12(d) cannot be considered a mere clarification of the prior law regarding "good cause" for terminating a sales agreement and could not be applied retroactively for that reason.

■ In sum, under the preexisting law, Village Ford was able to sue Ford on the theory that Ford lacked good cause to terminate the Agreement. A law delegating the resolution of such disputes to an administrative agency in the first instance was merely procedural and did not affect Ford's vested rights under the Agreement. Applying the standard of "good cause" as defined in section 12(d) would have impinged on Ford's vested rights. However, the Motor Vehicle Review Board could constitutionally decide the issue of "good cause" in this case, despite the absence of an applicable statutory definition.

IV

Finally, Ford contends that the Motor Vehicle Review Board erred in its application of the "good cause" standard in this case. Ford correctly notes that good cause has been defined as a failure to substantially comply with the obligations under the agreement. *Dayan*, 125 Ill. App. 3d at 993, 466 N.E.2d at 973; see *7-Eleven, Inc. v. Dar*, 325 Ill. App. 3d 399, 408, 757 N.E.2d 515, 522 (2001) (applying standard). However, Ford also argues that the test of "commercial reasonableness" applied by the Motor Vehicle Review Board was not applied in *Dayan* and has never been applied by any Illinois court. This is incorrect. See *Kawasaki Shop of Aurora, Inc. v. Kawasaki Motors Corp., U.S.A.*, 188 Ill. App. 3d 664, 675, 544 N.E.2d 457, 463-64 (1989) (quoting *Dayan* in reference to compliance with the agreement, commercial reasonableness and breaches of contract affecting the franchisor in marketing the product). Moreover, *Dayan* itself is based on the implied covenant of good faith; the duty imposed by that covenant requires the party vested with discretion under a contract to "exercise that discretion reasonably and with proper motive, *** not *** arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Dayan*, 125 Ill. App. 3d at 991, 466 N.E.2d at

972. In the context of a commercial agreement, which the Agreement most certainly is, it follows that the reasonableness required by *Dayan* is commercial reasonableness.

■ On administrative review, this court's focus is on the administrative agency's decision and not the decision of the circuit court. *XL Disposal Corp. v. Zehnder*, 304 Ill. App. 3d 202, 207, 709 N.E.2d 293, 297 (1999). An administrative agency's findings on questions of fact are deemed to be *prima facie* true and correct and will not be reversed unless they are against the manifest weight of the evidence. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998). An agency's findings and decisions are against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992). The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. *DeCastris v. State Employees Retirement System*, 288 Ill. App. 3d 136, 143, 679 N.E.2d 825, 830 (1997). Also, because the weight of the evidence and the credibility of the witnesses are generally within the province of the board, there need only be some competent evidence in the record to support its findings. *Iwanski v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184, 596 N.E.2d 691, 694 (1992).

■ However, unlike agency findings of fact, determinations of cause for discharge are not *prima facie* true and correct. *McCleary v. Board of Fire & Police Commissioners*, 251 Ill. App. 3d 988, 998, 622 N.E.2d 1257, 1265 (1993). The Board's ruling on a question of law is reviewed on a *de novo* basis. See *City of Belvidere*, 181 Ill. 2d at 205, 692 N.E.2d at 302. A mixed question of fact and law is reviewed under the clearly erroneous standard. See *City of Belvidere*, 181 Ill. 2d at 205, 692 N.E.2d at 302. Applying this last standard to mixed questions provides some deference to the experience and expertise of an administrative agency or board. *City of Belvidere*, 181 Ill. 2d at 205, 692 N.E.2d at 302. Under this standard, this court will reverse only if, after review of the entire record, this court is left with the definite and firm conviction that a mistake has been committed. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395, 763 N.E.2d 272, 282 (2001).

■ Ford appears to be correct that a "good cause" determination is a mixed question, particularly as "good cause" is the sort of term not readily susceptible to a universal definition. Ford is also correct that the Motor Vehicle Review Board itself found a number of instances in which Village Ford did not meet its obligations under the

Agreement. However, Ford chooses to overlook the numerous findings of fact regarding Ford's definition of the PMA, particularly given that Village Ford had sales in the top 15% of the Chicago Region in 1998, Ford's failure to adequately consider how the changing nature of Village Ford's location (a location to which Ford urged Village Ford to move), resulting from the removal of the 135th Street Bridge, contributed to Village Ford's failures to meet its obligations, and Ford's attempt to impose a two-year agreement in return for permission to relocate to the growing area north of I-55, which led the Motor Vehicle Review Board to conclude that Ford had failed to show good cause to terminate its Agreement with Village Ford. Given the record, this court is not left with the firm and definite conviction that a mistake has been committed.

For all of these reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

REID and HARTIGAN, JJ., concur.