FOURTH DIVISION
March 16, 2006

No. 1-05-1752 & 1-05-1772, Consol.

| | | |
|---|---|---|
| JOSEPH A. YAKUBINIS, d/b/a Collinsville Yamaha, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04L50209 |
| | ) | |
| YAMAHA MOTOR CORPORATION, U.S.A., and | ) | |
| ILLINOIS MOTOR VEHICLE REVIEW BOARD, | ) | The Honorable |
| Terrence M. O'Brien, in his official capacity as | ) | Nancy J. Arnold, |
| Chairperson of the Motor Vehicle Review Board, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellants. | ) | |

JUSTICE GREIMAN delivered the opinion of the court:

Defendants, the State of Illinois Motor Vehicle Review Board (the Board) and Yamaha Motor Corporation (Yamaha), appeal a trial court order reversing the Board's dismissal of a protest filed by plaintiff, Joseph A. Yakubinis, doing business as Collinsville Yamaha (Yakubinis), which alleged that Yamaha did not have good cause to relocate another Yamaha franchisee into Yakubinis's relevant market area, and remanding the protest to the Board for a hearing on its merits. On appeal, defendants contend that the trial court erred in finding that sections 4(e)(8) and 12(c) of the Motor Vehicle Franchise Act (the Act) (815 ILCS 710/4(e)(8), 12(c) (West 2002)), which became effective in 1995 and provide the grounds and procedure for Yakubinis's protest, were applicable to Yakubinis and Yamaha's 1989 franchise agreement.

Yakubinis entered his first franchise agreement with Yamaha in 1986. In 1989, he entered a second franchise agreement with Yamaha that superceded and replaced the 1986

agreement. Pursuant to the agreements, Yakubinis owned and operated a Yamaha franchise in Collinsville, Illinois. The 1989 agreement provided:

> "The rights granted herein are nonexclusive. Yamaha reserves the right to appoint additional dealers of any or all of the Products at any time pursuant to Yamaha's marketing program and policies."

Victory Lanes Power Sports (Victory Lanes) entered a franchise agreement with Yamaha in 2000. Pursuant to the agreement, Victory Lanes owned and operated a Yamaha franchise in Dupo, Illinois. In 2003, Yamaha proposed to move Victory Lanes' franchise to Swansea, Illinois, 9.5 miles from Yakubinis's franchise. The parties agree that the new Victory Lanes location is in Yakubinis's relevant market area.

Upon learning of Victory Lanes' proposed move, Yakubinis filed a protest with the Board in which he alleged that the move violated section 4(e)(8) of the Act. Section 4(e)(8) provides that a franchisor violates the Act if it relocates a motor vehicle dealership into the relevant market area of an existing franchise of the same line without good cause and that upon the filing of a protest by the existing franchisee, the Board shall conduct a hearing to determine whether good cause exists to allow the relocation pursuant to the criteria articulated in section 12(c) of the Act (815 ILCS 710/12(c) (West 2002)). 815 ILCS 710/4(e)(8) (West 2002).

The Board initially dismissed Yakubinis's protest for lack of jurisdiction. In a letter to Yakubinis, the Board explained that in Fields Jeep-Eagle, Inc. v. Chrysler Corp., 163 Ill. 2d 462 (1995), the supreme court found that former sections 4(e)(8) and 12(c) (815 ILCS 710/4(e)(8), 12(c) (West 1992)), which left the good-cause determination to the trial court, violated the

1-05-1752 & 1-05-1772, consol.

doctrine of separation of powers because they delegated for judicial examination matters that were for legislative or administrative determination. New sections 4(e)(8) and 12(c) did not become effective until 1995. See Pub. Act 89-145, eff. July 14, 1995. The Board concluded that, because Yakubinis and Yamaha had entered their agreement prior to 1995, new sections 4(e)(8) and 12(c), relegating the good-cause determination to the Board, did not apply and the Board did not have jurisdiction to hear Yakubinis's protest.

Yakubinis petitioned the Board to reconsider its disposition, arguing that, as a third-party beneficiary of the contract between Yamaha and Victory Lanes, he was entitled to the protection of new sections 4(e)(8) and 12(c); that the 1995 amendment creating new sections 4(e)(8) and 12(c) was procedural and therefore the sections should be applied retroactively to his franchise agreement; that he had been denied due process and equal protection of the law because he had not been afforded the same right to protest a relocation as Victory Lanes; and that a 2003 product addendum to his franchise agreement with Yamaha subjected the entire franchise agreement to the 1995 amendment. After considering the issues raised by Yakubinis, the Board's hearing officer issued an analysis of the Board's jurisdiction, which was consistent with the Board's original letter dismissing the protest, and recommended that the Board dismiss the protest. The Board adopted the hearing officer's decision and dismissed the protest.

Yakubinis filed a complaint for judicial review of the Board's decision in the trial court, raising the same arguments that he had raised before the Board.

Following a hearing on the issues, the trial court entered a written order. The court began by noting that though the Board had based its dismissal of Yakubinis's protest on its lack of

1-05-1752 & 1-05-1772, consol.

jurisdiction, the issue in the case was not jurisdictional. Instead, the trial court framed the issue as "whether applying a certain statutory provision would be a retroactive application of substantive law and, if so, whether such application would be appropriate." The court acknowledged the supreme court's decision in Fields that former sections 4(e)(8) and 12(c) of the Act, under which Yakubinis and Yamaha had entered their franchise agreement, were unconstitutional and that ordinarily the sections would, therefore, be considered void *ab initio*. However, relying on Perlstein v. Wolk, 349 Ill. App. 3d 161 (2004), *aff'd*, No. 98909 (February 17, 2006), and the special concurrence in People v. Gersch, 135 Ill. 2d 384 (1990) (Miller, J., specially concurring), the court determined that public policy did not favor strict application of the void *ab initio* doctrine in this case. The court further determined that the amendment creating new sections 4(e)(8) and 12(c) constituted a procedural, rather than a substantive, change to the law and the sections could therefore be applied retroactively. Accordingly, the trial court reversed the Board's dismissal of Yakubinis's protest and remanded the matter to the Board for a hearing on the merits of the protest. Defendants sought leave to appeal the trial court's order. We granted defendants' request and consolidated defendants' appeals.

On appeal defendants contend that the trial court erred in refusing to apply the void *ab initio* doctrine and in finding that amendments to that Act creating new sections 4(e)(8) and 12(c) were procedural and should be applied retroactively.

Yakubinis first responds that we lack jurisdiction to consider defendants' appeal pursuant to Supreme Court Rule 306(a)(6) (Official Reports Advance Sheet No. 26 (December 24, 2003), R. 306(a)(6), eff. January 1, 2004), as defendants aver in their appellate briefs.

˘4˘

1-05-1752 & 1-05-1772, consol.

Generally, when a trial court reverses an administrative agency's decision and remands the matter for further proceedings involving the resolution of questions of law or fact, the order is interlocutory and is not appealable. Trunek v. Industrial Comm'n, 345 Ill. App. 3d 126, 127 (2003). However, Rule 306(a)(6) provides the process by which an appellant may appeal "an otherwise nonfinal circuit court order that remands a case for a hearing de novo before an administrative agency." Trunek, 345 Ill. App. 3d at 128.

Defendants correctly relied on this rule in their jurisdictional statements and also followed the requirements of the rule by seeking leave to appeal by filing a petition before this court. Accordingly, we have jurisdiction to consider defendants' appeal.

We turn now to the substance of defendants' argument. We will begin with a brief overview of sections 4(e)(8) and 12(c) of the Act.

Prior to Fields and the legislature's 1995 amendment to the Act, former section 4(e)(8) prohibited the relocation of a dealer into a franchisee's relevant market area without good cause. 815 ILCS 710/4(e)(8) (West 1992). However, former section 4(e)(8) left the determination of whether good cause existed to the courts. 815 ILCS 710/4(e)(8) (West 1992). Former section 12(c) articulated several criteria the court should consider in determining whether good cause existed. 815 ILCS 710/12(c) (West 1992).

In Fields, the constitutionality of former sections 4(e)(8) and 12(c) of the Act was examined. The supreme court held:

"[T]hrough sections 4(e)(8) and 12(c) of the Act, the General Assembly has impermissibly delegated for judicial examination matters which are for

˘5˘

1-05-1752 & 1-05-1772, consol.

legislative or administrative determination.  We hold that this impermissible

delegation violates the separation of powers clause of the Illinois Constitution.

*** In the cases before us, we simply conclude that the investigation into and

weighing of the statutory and nonstatutory factors in order to decide whether a

dealership should be established or relocated, and what the public interest and

welfare is in each case involving a proposed dealership, are not functions which

courts are equipped to perform nor which the legislature may constitutionally

require them to perform."  Fields, 163 Ill. 2d at 479-80.

Accordingly, the court held sections 4(e)(8) and 12(c) to be unconstitutional.

After Fields, the legislature established the Board and enacted new sections 4(e)(8) and

12(c), which became effective on July 14, 1995.  See Pub. Act 89-145, eff. July 14, 1995.  When

Yakubinis filed his complaint in the trial court, section 4(e)(8) provided:

"It shall be deemed a violation for a manufacturer, a distributor, a

wholesaler, a distributor branch or division officer, agent or other representative

thereof:

***

(8) *** to relocate an existing motor vehicle dealership

within or into a relevant market area of an existing franchise of the

same line make."  815 ILCS 710/4(e)(8) (West 2002).

Section 4(e)(8) further provided that, after notice of the relocation is served on the existing

franchise, if the parties cannot agree upon the relocation of the dealership, "the franchisee or

1-05-1752 & 1-05-1772, consol.

other person may file with the Board a written protest against the grant or establishment of the proposed *** relocated franchise." 815 ILCS 710/4(e)(8) (West 2002); General Motors Corp. v. Motor Vehicle Review Board, 361 Ill. App. 3d 271, 276 (2005). Thereafter, the Board shall schedule a hearing on the protest. 815 ILCS 710/4(e)(8) (West 2002); General Motors, 361 Ill. App. 3d at 276. At the hearing, "[t]he manufacturer shall have the burden of proof to establish that good cause exists to allow the grant or establishment of the additional or relocated franchise," and "[t]he determination whether good cause exists for allowing the grant or establishment of a[] *** relocated existing franchise, shall be made by the Board under subsection (c) of Section 12 of this Act." 815 ILCS 710/4(e)(8) (West 2002); General Motors, 361 Ill. App. 3d at 277.

New section 12(c) provided that, in determining whether good cause has been established for relocating an existing dealership, the court shall consider the relevant circumstance including, but not limited to, 11 articulated considerations. 815 ILCS 710/12(c) (West 2002).

Defendants contend that the trial court erred in refusing to apply the void *ab initio* doctrine. Yakubinis concedes that, under the void *ab initio* doctrine, the Fields decision rendered former sections 4(e)(8) and 12(c) "as if [they] never existed." People v. Andrews, 358 Ill. App. 3d 744, 768 (2005). Accordingly, pursuant to the doctrine, as a practical matter, when the parties entered the franchise agreement in 1989, Yamaha was not statutorily barred from relocating a dealer into Yakubinis's relevant market area without good cause. Nonetheless, Yakubinis argues that the trial court was correct in finding that public policy supports a departure from the void *ab initio* doctrine.

˅7˅

1-05-1752 & 1-05-1772, consol.

In support of his argument, Yakubinis cites <u>Perlstein</u>. In <u>Perlstein</u>, the plaintiffs, the deceased's wife and stepson, filed a complaint alleging that the defendant law firm had committed legal malpractice in drafting the deceased's estate planning documents. Section 13-214.3(d) of the Limitations Act (735 ILCS 5/13-214.3(d) (West 1994)), which became effective in 1991, provided a certain statute of limitations and statute of repose for a legal malpractice injury that does not occur until the death of the client. In March 1995, Public Act 89-7 eliminated section 13-214.3(d). Thereafter, a standard statute of limitations and statute of repose applied to all legal malpractice claims. On December 18, 1997, just before the plaintiffs filed their complaint, the supreme court in <u>Best v. Taylor Machine Works</u>, 179 Ill. 2d 367 (1997), found Public Act 89-7 unconstitutional in its entirety. Consequently, the filing of the plaintiff's complaint three weeks later on January 8, 1998, fell within the standard statute of limitations and statute of repose for all legal malpractice claims, but was untimely under the special limitations of section 13-214.3(d). Because the void *ab initio* doctrine required it to view the complaint as if Public Act 89-7 had never existed, the trial court dismissed the plaintiffs' complaint as untimely. The appellate court reversed the trial court's judgment, finding that the result reached by the trial court was fundamentally unfair.

On appeal to the supreme court, the defendants argued that case law mandated a strict application of the void *ab initio* doctrine while the plaintiffs advocated an approach to the doctrine that would take into account the equities of each individual case. The court first examined Illinois case law and determined that, though " 'in the area of *criminal prosecution*, the void *ab initio* principle is especially appropriate,' " (emphasis in original) (<u>Perlstein v. Wolk</u>, No.

1-05-1752 & 1-05-1772, consol.

98909, slip op. at 7 (February 17, 2006), quoting <u>Gersch</u>, 135 Ill. 2d at 400), Illinois courts had

not held that the void *ab initio* doctrine must be strictly applied despite harsh results. The court

refused to so hold, noting:

> "Defendants' position *** unduly discounts the real life consequences flowing
>
> from a statutory enactment. *** Individuals, including plaintiffs here, 'are entitled
>
> to rely on State statutes when "making decisions and in shaping their conduct." '
>
> [Citations.] Individuals are not required or empowered to determine whether the
>
> law is constitutional; that duty belongs to the judiciary. [Citation.] Strict
>
> application of the void *ab initio* doctrine fails to take into account these realities,
>
> creating a 'Catch-22.' Individuals are entitled to rely on a legislative enactment,
>
> presuming it is valid, but must suffer the consequences of doing so should this
>
> court later hold that law unconstitutional." <u>Perlstein</u>, slip op. at 9.

The court went on to consider the trend in the law occurring in Illinois's sister states,

where, rather than strictly applying the void *ab initio* doctrine, courts had adopted a more

moderate approach when determining the effect of a judicial declaration that a statute was

unconstitutional. The court was persuaded by the trend and determined:

> "In cases such as <u>Gersch</u>, where a defendant's constitutionally guaranteed rights
>
> are in need of vindication, strict application of the void *ab initio* doctrine is
>
> appropriate. In other cases, however, where no such rights are at stake, other
>
> equitable and practical factors are appropriate for consideration by this court. The
>
> issue is not so much a matter of applying or not applying the void *ab initio*

1-05-1752 & 1-05-1772, consol.

doctrine, as it is determining whether a particular set of circumstances justifies a court's exercise of its equitable powers to ameliorate the doctrine's sometimes harsh results." Perlstein, slip op. at 15.

Turning to the case before it, the court noted, "[o]ur case law firmly establishes that a change in the law shortening a limitations period will not be applied retroactively so as to terminate a cause of action unless the claimant has had a reasonable period of time after the effective date of the change in which to file an action." Perlstein, slip op. at 17. Such a rule is based on " 'basic concepts of justice, fairness and equity.' " Perlstein, slip op. at 17, quoting Phillips v. Johnson, 231 Ill. App. 3d 890, 895 (1992). In Perlstein, before the statutes of limitations and repose under Public Act 89-7 had expired on plaintiffs' claim, the supreme court found Public Act 89-7 unconstitutional. Consequently, pursuant to the void *ab initio* doctrine, plaintiffs' cause of action was instantaneously barred. Plaintiffs filed their complaint three weeks later, within a reasonable period of the change in law shortening the limitations period. Accordingly, the court determined that "the circumstances here justify the exercise of our equitable powers to ameliorate the harsh results from this court's declaration that Public Act 89-7 is void." Perlstein, slip op. at 18.

Concerning the case at bar, we first note that, in Perlstein, the court made clear that its decision did not "signal an abandonment of the void *ab initio* doctrine" and does not "require courts in other cases involving different litigants, different statutes, and different circumstances, to rule in favor of the party claiming reliance on a statute later held unconstitutional." Perlstein, slip op. at 18, 19. We agree with defendants that, in this case, the circumstances do not justify a

setting aside of the void *ab initio* doctrine. In <u>Perlstein</u>, the reasonable period doctrine, which was based on notions of fairness, was implicated. Here, on the contrary, no conflicting law advocated departure from the void *ab initio* doctrine.

Additionally, <u>Perlstein</u> concerned the procedure plaintiffs were to follow to enforce their substantive right to recourse for legal malpractice. Though, under <u>Best</u>, the plaintiffs' complaint asserting that right was not timely, their right remained valid. Accordingly, <u>Best</u> effected a procedural, rather than substantive, change in the law. To preclude the <u>Perlstein</u> plaintiffs from enforcing their still-valid right to recourse for legal malpractice because the procedure for enforcing the right had changed would be unfair. This is particularly true in light of the fact that there was no evidence to suggest that the plaintiffs had unreasonably delayed filing their complaint and they, in fact, filed their claim almost immediately after the change in the law. In this case, however, the change in the law effected by <u>Fields</u> was not simply procedural. On the contrary, in <u>Fields,</u> the court found former sections 4(e)(8) and 12(c), which *created* Yakubinis's substantive right to challenge as lacking good cause the relocation of another dealer into his relevant market area, unconstitutional. The effect of <u>Fields</u> was that Yakubinis did not have such a substantive right. Accordingly, applying the doctrine would not be fundamentally unfair, and we refuse to set aside the void *ab initio* doctrine under the circumstances of this case.

Defendants further contend that the trial court erred in finding that the amendments to sections 4(e)(8) and 12(c) were procedural, rather than substantive, and therefore may be applied retroactively to Yakubinis and Yamaha's franchise agreement.

In <u>Commonwealth Edison Co. v. Will County Collector</u>, 196 Ill. 2d 27 (2001), the

1-05-1752 & 1-05-1772, consol.

supreme court adopted the United States Supreme Court's retroactivity analysis set forth in Landgraf v. USI Film Products, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994). Under the analysis, in determining whether a statute will be applied retroactively, a court first asks whether the legislature has clearly indicated the temporal reach of an amended statute. Commonwealth Edison, 196 Ill. 2d at 38. If so, that expression of legislative intent must be given effect unless it is constitutionally prohibited. Commonwealth Edison, 196 Ill. 2d at 38. If not, the court must ask whether applying the statute would have a retroactive impact. Commonwealth Edison, 196 Ill. 2d at 38. If not, it may be applied retroactively. Commonwealth Edison, 196 Ill. 2d at 38. In Illinois, the legislature has clearly indicated the temporal reach of every amended statute in section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2002)). Caveney v. Bower, 207 Ill. 2d 82, 92 (2003). "[S]ection 4 represents a clear legislative directive as to the temporal reach of statutory amendments and repeals: those that are procedural in nature may be applied retroactively, while those that are substantive may not." Caveney, 207 Ill. 2d at 92. Notably, the provisions of the Act have not been applied retroactively to franchise agreements entered prior to the Act's enactment. See, e.g., Velde Ford Sales, Inc. v. John Bearce Ford, Inc., 201 Ill. App. 3d 866 (1990); Fireside Chrysler-Plymouth Mazda, Inc. v. Chrysler Corp., 129 Ill. App. 3d 575 (1984); McAleer Buick-Pontiac Co. v. General Motors Corp., 95 Ill. App. 3d 111 (1981); Ace Cycle World, Inc. v. American Honda Motor Co., 788 F.2d 1225 (1986); McKay Nissan, Ltd. v. Nissan Motor Corp. In U.S.A., 764 F. Supp. 1318 (1991); North Broadway Motors, Inc. v. Fiat Motors of North America, Inc., 622 F. Supp. 466 (1984).

1-05-1752 & 1-05-1772, consol.

As discussed above, under the void *ab initio* doctrine, when former sections 4(e)(8) and 12(c) were held unconstitutional in <u>Fields</u>, the legal effect was to "relegate the parties such rights as obtained prior to the enactment of the unconstitutional statute." <u>In re Marriage of Sullivan</u>, 342 Ill. App. 3d 560, 565 (2003). Accordingly, the 1995 amendment to the Act created not only a new procedure for relocation protests but also created the substantive right to protest the relocation of a dealer into an existing franchisee's market area without good cause. Because the amendment created a new right, it was clearly substantive and should operate prospectively only. See <u>Moshe v. Anchor Organization for Health Maintenance</u>, 199 Ill. App. 3d 585, 600 (1990).

Our finding is consistent with <u>Ace</u> and <u>Velde</u>. <u>Ace</u> concerned the retroactivity of a 1983 amendment to the Act that protected a franchisee from the creation of a new franchise within 10 miles of the franchisee's existing operation. The plaintiff franchisee and the defendant franchisor had entered a franchise agreement prior to the effective date of the amendment. In 1985, the defendant notified the plaintiff that it would establish a new franchise four miles from the plaintiff's dealership. The plaintiff brought suit to enjoin the defendant from establishing the new franchise. The district court, refusing to apply the 1983 amendment retroactively to the parties' franchise agreement, dismissed the suit for failure to state a cause of action under the Act. The appellate court noted that, when the franchise agreement was entered, the Act provided that "the scope of a relevant market area was limited to that area described in the franchise agreement, and if none was specified, none existed," and that the agreement failed to provide a description of the plaintiff's market area. <u>Ace</u>, 788 F.2d at 1228. Accordingly, the court affirmed the district court's judgment, finding that to apply the amendment retroactively would

˘13˘

1-05-1752 & 1-05-1772, consol.

violate the defendant's "vested contractual right under [the franchise agreement] to establish a new dealership in proximity to [the plaintiff]." Ace, 788 F.2d at 1229.

In Velde, the plaintiff franchisee and the defendant franchisor entered a franchise agreement in 1972, prior to the effective date of the Act, which provided that the defendant could appoint additional dealerships to the plaintiff's relevant market area after conducting a market study and providing notice to the plaintiff. In 1987, the defendant notified the plaintiff that, pursuant to a market study, it would relocate an existing dealership into the plaintiff's market area. The plaintiff sought judicial determination of whether good cause existed for the proposed relocation under the Act. The trial court dismissed the plaintiff's complaint and the appellate court affirmed, refusing to apply the Act retroactively to the 1972 agreement because to do so would impair the parties' vested contractual rights.

As discussed above, application of the void *ab initio* doctrine is appropriate in this case. Consequently, when Yamaha and Yakubinis entered the 1989 agreement, Yamaha was not statutorily prohibited from establishing new dealerships or relocating dealerships into Yakubinis's relevant market area. Accordingly, as in Ace and Velde, pursuant to the 1989 franchise agreement, Yamaha had a vested contractual right to establish and to appoint additional dealers within Yakubinis's market area pursuant to its marketing program and policies. To apply new sections 4(e)(8) and 12(c) retroactively would violate that vested right.

Our finding that the amendments to sections 4(e)(8) and 12(c) should not be applied retroactively is also consistent with the holding of Ford Motor Co. v. Motor Vehicle Review Board, 338 Ill. App. 3d 880 (2003). The Ford court examined the effects of Fields and the

subsequent amendments to the Act. The facts of Ford are as follows. In 1984, Ford entered a service agreement with Village Ford, a Ford dealer. The agreement set forth sales and personnel obligations that Village Ford was required to meet and provided that either party was permitted to terminate the agreement under a variety of circumstances, including Village Ford's failure to meet its obligations. From 1990 until 1998, though it remained in the top 15% of Ford dealers in the Chicago area, Village Ford's sales declined. In 1999, Ford sent a notice of termination to Village Ford, citing below average sales as its justification for termination. Village Ford filed notice of protest with the Board, alleging that Ford lacked good cause to terminate the service agreement. The Board agreed that Ford lacked good cause and the trial court affirmed the Board's decision. Ford appealed.

The appellate court noted that, at the time that Ford and Village Ford entered their agreement, former section 4(d)(6) of the Act prohibited the termination of a franchise or service agreement without good cause and former section 12(c) of the Act provided statutory factors a court was to consider in determining whether good cause existed. Thereafter, Fields was decided, invalidating former sections 4(e)(8) and 12(c) of the Act. The court explained that after Fields, the legislature amended the Act, establishing a Board that would hear allegations of a lack of good cause. The issue, the court determined, was which provisions of the amended Act should be applied retroactively. The court found that the "amendments creating the [Board] and empowering it to decide termination disputes in general may be applied retroactively, as they are merely procedural, and no vested rights are involved on that point." Ford, 338 Ill. App. 3d at 889.

1-05-1752 & 1-05-1772, consol.

Concerning section 4(d)(6) of the Act, the court noted that, at the time that the parties entered the agreement, that provision did not expressly require a court to determine whether good cause existed. It was not, therefore, constitutionally infirm for the reasons articulated in Fields. Moreover, regardless of whether the Act so provided, there existed a common law prohibition against the termination of a contract without good cause.

On this point, the court cited Dayan v. McDonald's Corp., 125 Ill. App. 3d 972 (1984), which held that, "under the implied covenant of good faith that exists in all contracts, a franchisor may not terminate a franchise agreement except where good cause exists." Ford, 338 Ill. App. 3d at 888. The Ford court noted that Dayan was distinguishable from McAleer. In McAleer, when the franchise agreement between the parties was entered, there was no statute forbidding nonrenewal of the agreement without a showing of good cause. In determining whether the Act should be applied retroactively to forbid nonrenewal without good cause, the McAleer court noted:

> "Although McAleer has cited some cases requiring good faith for termination of a
> contractual relationship [citation], these cases cannot be viewed as requiring good
> cause for nonrenewal of an agreement. Thus, when GMC and McAleer entered
> this agreement, each party acquired the right to refuse to renew it without
> showing good cause." McAleer, 95 Ill. App. 3d at 113.

Because to do so would affect the parties' rights that vested at the time they entered the agreement, the McAleer court refused to apply the Act retroactively. Accordingly, there was neither a statutory nor a common law requirement that the nonrenewing party show good cause.

˘16˘

The Ford court further addressed the retroactive application of the good-cause considerations articulated in section 12(c) of the Act. Ford conceded that, because section 12(c) had been held unconstitutional in Fields, it was void *ab initio*. The court noted that the good-cause considerations of section 12(c) differed from the common law good-cause considerations. The court concluded that the Board was, therefore, correct to consider common law good-cause considerations rather than the statutory considerations of section 12(c).

The court concluded:

"In sum, under the preexisting law, Village Ford was able to sue Ford on the theory that Ford lacked good cause to terminate the Agreement. A law delegating the resolution of such disputes to an administrative agency in the first instance was merely procedural and did not affect Ford's vested rights under the Agreement. Applying the standard of 'good cause' as defined in section 12(d) would have impinged on Ford's vested rights. However, the [Board] could constitutionally decide the issue of 'good cause' in this case, despite the absence of an applicable statutory definition." Ford, 338 Ill. App. 3d at 890.

Notably, consistent with our holding, the Ford court refused to apply section 12(c) retroactively because, though former section 12(c) was in effect at the time the parties entered their agreement, Fields rendered former 12(c) void *ab initio*. Accordingly, to apply new section 12(c) to the agreement would impermissibly affect the parties' vested rights. Moreover, in Ford, common law required a terminating manufacturer to show good cause. Yakubinis attempts to analogize the right provided in section 4(e)(8) to that discussed in Ford, referring to it throughout

1-05-1752 & 1-05-1772, consol.

his brief as a "general right" and declaring that it is a right created by common law. However, he has not cited, nor are we aware of, any case creating or acknowledging a common law right that bars a manufacturer from relocating a dealer into its franchisee's relevant market area without good cause. Accordingly, as in McAleer, because we will not apply the substantive provisions of amended section 4(e)(8) retroactively and common law does not provide the right, Yakubinis does not have a right to protest the relocation of another dealer into his relevant market area without good cause.

Yakubinis urges us to affirm the trial court's judgment on the grounds that he is a third-party beneficiary of the contract between Yamaha and Victory Lanes which was formed after the 1995 amendments.

" '[T]he law regarding third-party beneficiaries is well established. A third-party beneficiary may sue for breach of a contract made for his benefit. [Citation.] A third party may only sue for breach of contract, however, if the contract was entered into for the party's direct benefit; if the third-party's benefit is merely incidental, he has no right of recovery on the contract. [Citations.] Whether a third party is a direct beneficiary depends on the intention of the parties, which must "be gleaned from a consideration of all of the contract and the circumstances surrounding the parties at the time of its execution." [Citation.]' " People ex rel. Hartigan v. Community Hospital of Evanston, 189 Ill. App. 3d 206, 217 (1989), quoting Alaniz v. Schal Associates, 175 Ill. App. 3d 310, 312 (1988), quoting Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 258 (1931).

˘18˘

1-05-1752 & 1-05-1772, consol.

Yakubinis's contention fails because Victory Lanes and Yamaha's contract was certainly not entered for Yakubinis's benefit and any benefit that he derived from that contract was strictly incidental. Moreover, Yakubinis has not sued for breach of the contract between Victory Lanes and Yamaha nor does he allege that the contract was breached.

Finally, Yakubinis asks that we affirm the trial court's judgment on the grounds that allowing Victory Lanes, which entered its franchise agreement after the 1995 amendments, to file a relocation protest but disallowing Yakubinis from doing so amounts to a violation of Yakubinis's equal protection right. Put another way, Yakubinis alleges that applying the amendments prospectively only violates his right to equal protection.

"The guarantee of equal protection requires the government to treat similarly situated individuals in a similar fashion. [Citation.] It does not prevent the government from drawing distinctions between different categories of people in enacting legislation, but it does prohibit the government from doing so on the basis of criteria wholly unrelated to the legislation's purpose. [Citation.] Where legislation does not affect a fundamental right or involve a suspect or quasi-suspect classification, the appropriate level of scrutiny is the rational basis test. [Citation.] Under the rational basis test, a court's review of a classification is limited and deferential. [Citation.] The court simply inquires whether the means the statute employs to achieve its purpose are rationally related to that purpose. [Citation.] If any set of facts can reasonably be conceived to justify the classification, it will not be construed as violating the equal protection guarantee."

˘19˘

1-05-1752 & 1-05-1772, consol.

Wauconda Fire Protection District v. Stonewall Orchards, LLP, 214 Ill. 2d 417, 434 (2005).

The purpose of applying sections 4(e)(8) and 12(c) prospectively is to protect the vested contract rights of the parties. We find that distinguishing between franchisees who entered franchise agreements prior to the 1995 amendments to the Act and franchisees who entered franchise agreements after the 1995 amendments to the Act is rationally related to that purpose. At the time franchisees who entered agreements prior to the amendments, like Yakubinis, contracted with franchisors, no constitutional provision forbade the franchisors from relocating other dealers in the franchisees' market areas without good cause. Accordingly, to protect the franchisors' vested rights, it is reasonable to apply the 1995 amendments prospectively only.

For the above-stated reasons, we reverse the judgment of the trial court. We further note that the Board is only authorized to hear "protests filed under Sections 4, 5, 6, 7, 9, 10.1, 11, and 12 of [the] Act." 815 ILCS 710/18(a) (West 2002). Because, as discussed above, section 4(e)(8) may not be applied retroactively to Yakubinis's 1989 franchise agreement, Yakubinis failed to state a cause of action under that section. Accordingly, the Board was correct in finding that it did not have jurisdiction to consider Yakubinis's protest. Finally, we note that our decision does not preclude Yakubinis from filing a common law breach of contract action in the trial court should he determine that, when it relocated Victory Lanes, Yamaha breached the 1989 franchise agreement in violating its "marketing program and policies."

Reversed.

QUINN, P.J., and CAMPBELL, J., concur.

1-05-1752 & 1-05-1772, consol.